# CHICAGO TEACHERS UNION, LOCAL NO. 1, AFT, AFL–CIO, ET AL. *v.* HUDSON ET AL.

No. 84–1503.   Argued December 2, 1985—Decided March 4, 1986

STEVENS, J., delivered the opinion for a unanimous Court. WHITE, J., filed a concurring opinion, in which BURGER, C. J., joined, *post*, p. 311.

*Laurence Gold* argued the cause for petitioners. With him on the briefs were *Joseph M. Jacobs, Charles Orlove, Nancy E. Tripp, Thomas P. Brown, Patricia S. Whitten, Lawrence A. Poltrock, Wayne B. Giampietro*, and *David M. Silberman*.

*Edwin Vieira, Jr.*, argued the cause and filed a brief for respondents.*

---

*\*Robert H. Chanin* and *James J. Brudney* filed a brief for the National Education Association as *amicus curiae* urging reversal.

*Ronald A. Zumbrun, John H. Findley*, and *Anthony T. Caso* filed a brief for William Cumero as *amicus curiae*.

JUSTICE STEVENS delivered the opinion of the Court.

In *Abood* v. *Detroit Board of Education*, 431 U. S. 209 (1977), "we found no constitutional barrier to an agency shop agreement between a municipality and a teacher's union insofar as the agreement required every employee in the unit to pay a service fee to defray the costs of collective bargaining, contract administration, and grievance adjustment. The union, however, could not, consistently with the Constitution, collect from dissenting employees any sums for the support of ideological causes not germane to its duties as collective-bargaining agent." *Ellis* v. *Railway Clerks*, 466 U. S. 435, 447 (1984). The *Ellis* case was primarily concerned with the need "to define the line between union expenditures that all employees must help defray and those that are not sufficiently related to collective bargaining to justify their being imposed on dissenters." *Ibid.* In contrast, this case concerns the constitutionality of the procedure adopted by the Chicago Teachers Union, with the approval of the Chicago Board of Education, to draw that necessary line and to respond to nonmembers' objections to the manner in which it was drawn.

I

The Chicago Teachers Union has acted as the exclusive collective-bargaining representative of the Board's educational employees continuously since 1967. Approximately 95% of the 27,500 employees in the bargaining unit are members of the Union. Until December 1982, the Union members' dues financed the entire cost of the Union's collective bargaining and contract administration. Nonmembers received the benefits of the Union's representation without making any financial contribution to its cost.

In an attempt to solve this "free rider" problem, the Union made several proposals for a "fair share fee" clause in the labor contract. Because the Illinois School Code did not expressly authorize such a provision, the Board rejected these proposals until the Illinois General Assembly amended the

School Code in 1981.[1] In the following year, the Chicago Teachers Union and the Chicago Board of Education entered into an agreement requiring the Board to deduct "proportionate share payments" from the paychecks of nonmembers. The new contractual provision authorized the Union to specify the amount of the payment; it stipulated that the amount could not exceed the members' dues. The contractual provision also required the Union to indemnify the Board for all action taken to implement the new provision.

For the 1982–1983 school year, the Union determined that the "proportionate share" assessed on nonmembers was 95% of union dues. At that time, the union dues were $17.35 per month for teachers and $12.15 per month for other covered employees; the corresponding deduction from the nonmembers' checks thus amounted to $16.48 and $11.54 for each of the 10 months that dues were payable.

Union officials computed the 95% fee on the basis of the Union's financial records for the fiscal year ending on June 30, 1982. They identified expenditures unrelated to collective bargaining and contract administration (which they estimated as $188,549.82). They divided this amount by the Union's income for the year ($4,103,701.58) to produce a percentage of 4.6%; the figure was then rounded off to 5% to provide a "cushion" to cover any inadvertent errors.

---

[1] The statute, which became effective on August 1, 1981, provided:

"Where a collective bargaining agreement is entered into with an employee representative organization, the school board may include in the agreement a provision requiring employees covered by the agreement who are not members of the representative organization to pay their proportionate share of the cost of the collective bargaining process and contract administration, measured by the amount of dues uniformly required by members. In such case, proportionate share payments shall be deducted by the board from the earnings of the non-member employees and paid to the representative organization." Ill. Rev. Stat., ch. 122, ¶ 10–22.40a (1983).

That statute has now been superseded by the Illinois Educational Labor Relations Act, Ill. Rev. Stat., ch. 48, ¶ 1701 et seq. (Supp. 1984).

The Union also established a procedure for considering objections by nonmembers. Before the deduction was made, the nonmember could not raise any objection. After the deduction was made, a nonmember could object to the "proportionate share" figure by writing to the Union President within 30 days after the first payroll deduction. The objection then would meet a three-stage procedure. First, the Union's Executive Committee would consider the objection and notify the objector within 30 days of its decision. Second, if the objector disagreed with that decision and appealed within another 30 days, the Union's Executive Board would consider the objection. Third, if the objector continued to protest after the Executive Board decision, the Union President would select an arbitrator from a list maintained by the Illinois Board of Education. The Union would pay for the arbitration, and, if there were multiple objections, they could be consolidated. If an objection was sustained at any stage of the procedure, the remedy would be an immediate reduction in the amount of future deductions for all nonmembers and a rebate for the objector.

In October 1982, the Union formally requested the Board to begin making deductions and advised it that a hearing procedure had been established for nonmembers' objections. The Board accepted the Union's 95% determination without questioning its method of calculation and without asking to review any of the records supporting it. The Board began to deduct the fee from the paychecks of nonmembers in December 1982. The Board did not provide the nonmembers with any explanation of the calculation, or of the Union's procedures. The Union did undertake certain informational efforts. It asked its member delegates at all schools to distribute flyers, display posters, inform nonmembers of the deductions, and invite nonmembers to join the Union with an amnesty for past fines. It also described the deduction and the protest procedures in the December issue of the Union newspaper, which was distributed to nonmembers.

Three nonmembers—Annie Lee Hudson, K. Celeste Campbell, and Walter Sherrill—sent identical letters of protest to the Union stating that they believed the Union was using part of their salary for purposes unrelated to collective bargaining and demanding that the deduction be reduced. A fourth nonmember—Beverly Underwood—objected to any deduction from her paycheck. The Union's response to each of the four briefly explained how the proportionate-share fee had been calculated, described the objection procedure, enclosed a copy of the Union Implementation Plan, and concluded with the advice that "any objection you may file" would be processed in compliance with that procedure. None of the letters was referred to the Executive Committee. Only Hudson wrote a second letter; her request for detailed financial information was answered with an invitation to make an appointment for an "informational conference" at the Union's office, at which she could review the Union's financial records. The four nonmembers made no further effort to invoke the Union procedures; instead, they challenged the new procedure in court.

## II

In March 1983, the four nonmembers, joined by three other nonmembers who had not sent any letters,[2] filed suit in Federal District Court, naming as defendants, the Union, its officials, the Board, and the Board members. They objected to the Union procedure for three principal reasons: it violated their First Amendment rights to freedom of expression and association; it violated their Fourteenth Amendment due

---

[2] The three other nonmembers were Estherlene Holmes, Edna Rose McCoy, and Dr. Debra Ann Petitan. For an unknown reason, proportionate shares had not been deducted from McCoy's paycheck. 573 F. Supp. 1505, 1509, n. 6 (ND Ill. 1983). Proportionate shares had, however, been deducted from the paychecks of the other six plaintiffs. *Id.*, at 1509.

process rights; and it permitted the use of their proportionate shares for impermissible purposes.[3]

The District Court rejected the challenges. 573 F. Supp. 1505 (ND Ill. 1983). It first noted that the procedure passed the initial threshold established by an earlier Seventh Circuit opinion on the subject because the procedure itself was fair; it represented a good-faith effort by the Union; and it was not unduly cumbersome. The District Court then rejected the First Amendment objection because it found that the procedure was the "least restrictive means" to protect the non-members' First Amendment rights while also protecting the Union's legitimate interest in promptly obtaining service fees from nonmembers. The District Court also rejected the argument that the procedure deprived the plaintiffs of property without due process because it did not accept the plaintiffs' analogy to cases requiring predeprivation hearings. Finally, the District Court refused to reach the contention that the nonmembers' proportionate shares were, in fact, being used for impermissible purposes.[4] The District Court found that only two of the plaintiffs (Hudson and Underwood) had validly invoked the Union procedure; that only those two were thus entitled to rebates if their objections were sustained; and that any assessment of the permissible use of the funds should await the outcome of the Union procedure.

---

[3] Respondents relied on 42 U. S. C. § 1983 as a basis for their federal constitutional claims. They also alleged pendent state claims. The District Court rejected the pendent claims, and respondents have not pursued them. Similarly, respondents mounted a facial attack on the Illinois statute as violative of the First Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The District Court also rejected this facial attack.

[4] The plaintiffs had challenged, for instance, the Union's 95% calculation because more than half of the Union's income ($2,167,000 of an income of $4,103,701.58) was passed on to affiliated state and national labor organizations. The plaintiffs claimed that some of this money was expended for political or ideological activities.

The posture of the case changed significantly in the Court of Appeals. The plaintiffs no longer focused on the claim that particular expenditures were inappropriate; they concentrated their attack on the procedure used by the Union to determine the amount of the deductions and to respond to their objections.[5] The Union also modified its position. Instead of defending the procedure upheld by the District Court, it advised the Court of Appeals that it had voluntarily placed all of the dissenters' agency fees in escrow, and thereby avoided any danger that respondents' constitutional rights would be violated.

The Court of Appeals was unanimous in its judgment reversing the District Court. 743 F. 2d 1187 (CA7 1984). All three judges agreed that the Constitution requires the Union to follow a procedure that protects the nonmembers from being compelled to subsidize political or ideological activities not germane to the collective-bargaining process, that the Union's objection procedure was inadequate, and that any rebate which allowed the Union temporary use of money for activities that violate the nonmembers' rights was unconstitutional. In his concurring opinion, however, Judge Flaum declined to reach certain questions discussed by the majority.

Specifically, the majority concluded that the category of impermissible expenditures included all those that were not germane to collective bargaining, even if they might not be characterized as "political or ideological." Judge Flaum found it unnecessary to reach this constitutional issue because the procedure could be deemed inadequate without deciding it and because, in his view, the collective-bargaining agreement and the Illinois statute limited agency shop fees to collective-bargaining and representational expenses. How-

---

[5] "The unusual feature of this case is that the plaintiffs, while objecting in passing to particular uses of the agency fee, make almost their whole attack on the procedure for determining how much shall be deducted." 743 F. 2d 1187, 1191 (CA7 1984). Respondents do not dispute this assessment.

ever, the majority believed that its conclusion derived from the fact that the possible infringement on the "liberty" of the nonmembers was not limited to the forced subsidization of political or ideological views, but also included the negative dimension of the freedom of association.

Determining that the Union's existing procedure was constitutionally inadequate, and that the Union "must go back to the drawing board," *id.*, at 1196, the majority suggested that the "constitutional minimum" of any revised procedure must include "fair notice, a prompt administrative hearing before the Board of Education or some other state or local agency— the hearing to incorporate the usual safeguards for evidentiary hearings before administrative agencies—and a right of judicial review of the agency's decision. The combination of an internal union remedy and an arbitration procedure is unlikely to satisfy constitutional requirements given the nature of the issues to be decided and the union's stake in how they are decided." *Ibid.*[6]

In response to the Union's advice that it had voluntarily placed dissenters' agency fees in escrow, the majority noted that the Union had made no commitment to continue the escrow in the future, had not indicated the terms of the escrow, and, in all events, "[t]he terms cannot be left entirely up to the Union." *Id.*, at 1197.

The importance of the case, and the divergent approaches of other courts to the issue,[7] led us to grant certiorari, 472

---

[6] Presumably because the First Amendment arguments were dispositive, neither the majority nor the concurrence mentioned the plaintiffs' objections that they were being deprived of property without due process. The majority viewed its freedom of association analysis in terms of the due process required for a deprivation of liberty. Like the District Court, moreover, the Seventh Circuit rejected the facial challenge to the constitutionality of the Illinois statute.

[7] See, *e. g.*, *Robinson* v. *New Jersey*, 741 F. 2d 598 (CA3 1984), cert. denied, 469 U. S. 1228 (1985); *Kempner* v. *Dearborn Local 2077*, 126 Mich. App. 452, 337 N. W. 2d 354 (1983), appeal dism'd, 469 U. S. 926 (1984); *White Cloud Education Assn.* v. *Board of Education*, 101 Mich. App. 309,

U. S. 1007 (1985). We affirm the judgment of the Court of Appeals, but we do not find it necessary to resolve all of the questions discussed in its opinion.

## III

In *Abood* v. *Detroit Board of Education*, 431 U. S. 209 (1977), we recognized that requiring nonunion employees to support their collective-bargaining representative "has an impact upon their First Amendment interests," *id.*, at 222, and may well "interfere in some way with an employee's freedom to associate for the advancement of ideas, or to refrain from doing so, as he sees fit," *ibid.* See also *id.*, at 255 (POWELL, J., concurring in judgment). We nevertheless rejected the claim that it was unconstitutional for a public employer to designate a union as the exclusive collective-bargaining representative of its employees, and to require nonunion employees, as a condition of employment, to pay a fair share of the union's cost of negotiating and administering a collective-bargaining agreement.[8] We also held, however, that nonunion employees do have a constitutional right to

---

300 N. W. 2d 551 (1980), appeal dism'd, 469 U. S. 875 (1984); *School Committee of Greenfield* v. *Greenfield Education Assn.*, 385 Mass. 70, 431 N. E. 2d 180 (1982); *Association of Capitol Powerhouse Engineers* v. *Division of Building and Grounds*, 89 Wash. 2d 177, 570 P. 2d 1042 (1977).

[8] Earlier cases had construed the Railway Labor Act to permit a similar arrangement without violating the Constitution. See *Railway Clerks* v. *Allen*, 373 U. S. 113 (1963); *Machinists* v. *Street*, 367 U. S. 740 (1961); *Railway Employees* v. *Hanson*, 351 U. S. 225 (1956). In *Abood*, we emphasized that those cases reflected the important "principle of exclusive union representation," 431 U. S., at 220, and that they accorded great weight to the congressional judgment that "it would promote peaceful labor relations to permit a union and an employer to conclude an agreement requiring employees who obtain the benefit of union representation to share its cost." *Id.*, at 219. See also *Ellis* v. *Railway Clerks*, 466 U. S. 435, 455–456 (1984) ("[B]y allowing the union shop at all, we have already countenanced a significant impingement on First Amendment rights. . . . It has long been settled that such interference with First Amendment rights is justified by the governmental interest in industrial peace").

"prevent the Union's spending a part of their required service fees to contribute to political candidates and to express political views unrelated to its duties as exclusive bargaining representative." *Id.*, at 234.[9]

The question presented in this case is whether the procedure used by the Chicago Teachers Union and approved by the Chicago Board of Education adequately protects the basic distinction drawn in *Abood*. "[T]he objective must be to devise a way of preventing compulsory subsidization of ideological activity by employees who object thereto without restricting the Union's ability to require every employee to contribute to the cost of collective-bargaining activities." *Id.*, at 237.

Procedural safeguards are necessary to achieve this objective for two reasons. First, although the government inter-

---

[9] We explained that this right is firmly grounded in the First Amendment:

"The fact that the appellants are compelled to make, rather than prohibited from making, contributions for political purposes works no less an infringement of their constitutional rights. For at the heart of the First Amendment is the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State. See *Elrod* v. *Burns,* [427 U. S.], at 356–357; *Stanley* v. *Georgia,* 394 U. S. 557, 565; *Cantwell* v. *Connecticut,* 310 U. S. 296, 303–304. . . .

. . . . .

"These principles prohibit a State from compelling any individual to affirm his belief in God, *Torcaso* v. *Watkins,* 367 U. S. 488, or to associate with a political party, *Elrod* v. *Burns, supra;* see 427 U. S., at 363–364, n. 17, as a condition of retaining public employment. They are no less applicable to the case at bar, and they thus prohibit the appellees from requiring any of the appellants to contribute to the support of an ideological cause he may oppose as a condition of holding a job as a public school teacher." 431 U. S., at 234–235 (footnote omitted).

We also emphasized that freedom of association, as well as freedom of expression, supported our conclusion. See *id.*, at 233. See also *Roberts* v. *United States Jaycees,* 468 U. S. 609, 623 (1984) (citing *Abood* for the principle that "[f]reedom of association . . . plainly presupposes a freedom not to associate").

est in labor peace is strong enough to support an "agency shop"[10] notwithstanding its limited infringement on non-union employees' constitutional rights, the fact that those rights are protected by the First Amendment requires that the procedure be carefully tailored to minimize the infringement.[11] Second, the nonunion employee—the individual whose First Amendment rights are being affected—must have a fair opportunity to identify the impact of the governmental action on his interests and to assert a meritorious First Amendment claim.[12]

In *Ellis* v. *Railway Clerks*, 466 U. S., at 443, we determined that, under the Railway Labor Act, a "pure rebate ap-

---

[10] Under an "agency shop" arrangement, a union that acts as exclusive bargaining representative may charge nonunion members, who do not have to join the union or pay union dues, a fee for acting as their bargaining representative. R. Gorman, Basic Text on Labor Law 642 (1976).

[11] See *Roberts* v. *United States Jaycees, supra,* at 623 (Infringements on freedom of association "may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms"); *Elrod* v. *Burns,* 427 U. S. 347, 363 (1976) (government means must be "least restrictive of freedom of belief and association"); *Kusper* v. *Pontikes,* 414 U. S. 51, 58–59 (1973) ("[E]ven when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty"); *NAACP* v. *Button,* 371 U. S. 415, 438 (1963) ("Precision of regulation must be the touchstone" in the First Amendment context).

[12] "[P]rocedural safeguards often have a special bite in the First Amendment context." G. Gunther, Cases and Materials on Constitutional Law 1373 (10th ed. 1980). Commentators have discussed the importance of procedural safeguards in our analysis of obscenity, Monaghan, First Amendment "Due Process," 83 Harv. L. Rev. 518, 520–524 (1970); overbreadth, L. Tribe, American Constitutional Law 734–736 (1978); vagueness, Gunther, *supra,* at 1373, n. 2, and 1185–1195; and public forum permits, Blasi, Prior Restraints on Demonstrations, 68 Mich. L. Rev. 1481, 1534–1572 (1970). The purpose of these safeguards is to insure that the government treads with sensitivity in areas freighted with First Amendment concerns. See generally Monaghan, *supra,* at 551 ("The first amendment due process cases have shown that first amendment rights are fragile and can be destroyed by insensitive procedures").

proach is inadequate." We explained that, under such an approach, in which the union refunds to the non-union employee any money to which the union was not entitled, "the union obtains an involuntary loan for purposes to which the employee objects." *Id.*, at 444. We noted the possibility of "readily available alternatives, such as advance reduction of dues and/or interest-bearing escrow accounts," *ibid.*, but, for purposes of that case, it was sufficient to strike down the rebate procedure.

In this case, we must determine whether the challenged Chicago Teachers Union procedure survives First Amendment scrutiny, either because the procedure upheld by the District Court was constitutionally sufficient, or because the subsequent adoption of an escrow arrangement cured any constitutional defect. We consider these questions in turn.[13]

## IV

The procedure that was initially adopted by the Union and considered by the District Court contained three funda-

---

[13] Respondents argue that this case should be considered through the prism of the procedural due process protections necessary for deprivations of property. As in *Abood*, we analyze the problem from the perspective of the First Amendment concerns. We are convinced that, in this context, the procedures required by the First Amendment also provide the protections necessary for any deprivation of property.

Moreover, in view of the fact that the First Amendment principles identified in *Abood* require procedural safeguards and in view of the fact that respondents' challenge is to the procedure, not the expenditures, we find it unnecessary to resolve any question concerning nongermane, nonideological expenditures. Unlike the Seventh Circuit, we are not convinced that resolution of the constitutional nongermaneness question will lead to appreciably different procedural requirements, and we thus find no need to reach that constitutional question. See *Rescue Army* v. *Municipal Court*, 331 U. S. 549, 568–572 (1947). Cf. *Ellis* v. *Railway Clerks*, 466 U. S. 435 (1984) (analyzing specific challenged expenditures under the Railway Labor Act and, as necessary, under the First Amendment).

mental flaws.[14]   First, as in *Ellis*, a remedy which merely offers dissenters the possibility of a rebate does not avoid the risk that dissenters' funds may be used temporarily for an improper purpose.   "[T]he Union should not be permitted to exact a service fee from nonmembers without first establishing a procedure which will avoid the risk that their funds will be used, even temporarily, to finance ideological activities unrelated to collective bargaining." *Abood*, 431 U. S., at 244 (concurring opinion).   The amount at stake for each individual dissenter does not diminish this concern.   For, whatever the amount, the quality of respondents' interest in not being compelled to subsidize the propagation of political or ideological views that they oppose is clear.   In *Abood*, we emphasized this point by quoting the comments of Thomas Jefferson and James Madison about the tyrannical character of forcing an individual to contribute even "three pence" for the "propagation of opinions which he disbelieves."[15]   A forced exaction followed by a rebate equal to the amount im-

---

[14] Like the Seventh Circuit, we consider the procedure as it was presented to the District Court.   It is clear that "voluntary cessation of allegedly illegal conduct does not moot a case." *United States* v. *Concentrated Phosphate Export Assn., Inc.*, 393 U. S. 199, 203 (1968).   See also *City of Mesquite* v. *Aladdin's Castle, Inc.*, 455 U. S. 283, 289 (1982); *United States* v. *W. T. Grant Co.*, 345 U. S. 629, 632 (1953).   The same concerns—the fear that a defendant would be "free to return to his old ways," *ibid.*, and that he would have "a powerful weapon against public law enforcement," *ibid.*—dictate that we review the legality of the practice defended before the District Court.'

[15] "James Madison, the First Amendment's author, wrote in defense of religious liberty: 'Who does not see . . . [t]hat the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever?' 2 The Writings of James Madison 186 (G. Hunt ed. 1901).   Thomas Jefferson agreed that 'to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical.' I. Brant, James Madison: The Nationalist 354 (1948)." *Abood*, 431 U. S., at 234–235, n. 31.

properly expended is thus not a permissible response to the nonunion employees' objections.

Second, the "advance reduction of dues" was inadequate because it provided nonmembers with inadequate information about the basis for the proportionate share. In *Abood*, we reiterated that the nonunion employee has the burden of raising an objection, but that the union retains the burden of proof: "'Since the unions possess the facts and records from which the proportion of political to total union expenditures can reasonably be calculated, basic considerations of fairness compel that they, not the individual employees, bear the burden of proving such proportion.'" *Abood*, 431 U. S., at 239–240, n. 40, quoting *Railway Clerks* v. *Allen*, 373 U. S. 113, 122 (1963).[16] Basic considerations of fairness, as well as concern for the First Amendment rights at stake, also dictate that the potential objectors be given sufficient information to gauge the propriety of the union's fee. Leaving the nonunion employees in the dark about the source of the figure for the agency fee—and requiring them to object in order to receive information—does not adequately protect the careful distinctions drawn in *Abood*.[17]

In this case, the original information given to the nonunion employees was inadequate. Instead of identifying the expenditures for collective bargaining and contract administra-

---

[16] The nonmember's "burden" is simply the obligation to make his objection known. See *Machinists* v. *Street*, 367 U. S., at 774 ("[D]issent is not to be presumed—it must affirmatively be made known to the union by the dissenting employee"); *Railway Clerks* v. *Allen*, 373 U. S., at 119; *Abood*, 431 U. S., at 238.

[17] Although public sector unions are not subject to the disclosure requirements of the Labor-Management Reporting and Disclosure Act, see 29 U. S. C. § 402(e), the fact that private sector unions have a duty of disclosure suggests that a limited notice requirement does not impose an undue burden on the union. This is not to suggest, of course, that the information required by that Act, see 29 U. S. C. § 431(b); 29 CFR § 403.3 (1985), is either necessary or sufficient to satisfy the First Amendment concerns in this context.

tion that had been provided for the benefit of nonmembers as well as members—and for which nonmembers as well as members can fairly be charged a fee—the Union identified the amount that it admittedly had expended for purposes that did not benefit dissenting nonmembers. An acknowledgment that nonmembers would not be required to pay any part of 5% of the Union's total annual expenditures was not an adequate disclosure of the reasons why they were required to pay their share of 95%.[18]

Finally, the original Union procedure was also defective because it did not provide for a reasonably prompt decision by an impartial decisionmaker. Although we have not so specified in the past,[19] we now conclude that such a requirement is necessary. The nonunion employee, whose First Amendment rights are affected by the agency shop itself and who bears the burden of objecting, is entitled to have his objections addressed in an expeditious, fair, and objective manner.[20]

---

[18] We continue to recognize that there are practical reasons why "[a]bsolute precision" in the calculation of the charge to nonmembers cannot be "expected or required." *Allen*, 373 U. S., at 122, quoted in *Abood*, 431 U. S., at 239–240, n. 40. Thus, for instance, the Union cannot be faulted for calculating its fee on the basis of its expenses during the preceding year. The Union need not provide nonmembers with an exhaustive and detailed list of all its expenditures, but adequate disclosure surely would include the major categories of expenses, as well as verification by an independent auditor. With respect to an item such as the Union's payment of $2,167,000 to its affiliated state and national labor organizations, see n. 4, *supra*, for instance, either a showing that none of it was used to subsidize activities for which nonmembers may not be charged, or an explanation of the share that was so used was surely required.

[19] Our prior opinions have merely suggested the desirability of an internal union remedy. See *Abood, supra*, at 240, and n. 41; *Allen, supra*, at 122.

[20] We reject the Union's suggestion that the availability of ordinary judicial remedies is sufficient. This contention misses the point. Since the agency shop itself is "a significant impingement on First Amendment rights," *Ellis*, 466 U. S., at 455, the government and union have a responsibility to provide procedures that minimize that impingement and that fa-

The Union's procedure does not meet this requirement. As the Seventh Circuit observed, the "most conspicuous feature of the procedure is that from start to finish it is entirely controlled by the union, which is an interested party, since it is the recipient of the agency fees paid by the dissenting employees." 743 F. 2d, at 1194–1195. The initial consideration of the agency fee is made by Union officials, and the first two steps of the review procedure (the Union Executive Committee and Executive Board) consist of Union officials. The third step—review by a Union-selected arbitrator—is also inadequate because the selection represents the Union's unrestricted choice from the state list.[21]

---

cilitate a nonunion employee's ability to protect his rights. We are considering here the procedural adequacy of the agency shop arrangement itself; we presume that the courts remain available as the ultimate protectors of constitutional rights.

In other First Amendment contexts, of course, we have required swift judicial review of the challenged governmental action. See, *e. g., Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S. 546 (1975); *Blount* v. *Rizzi,* 400 U. S. 410 (1971); *Freedman* v. *Maryland,* 380 U. S. 51 (1965). In this context, we do not believe that such special judicial procedures are necessary. Clearly, however, if a State chooses to provide extraordinarily swift judicial review for these challenges, that review would satisfy the requirement of a reasonably prompt decision by an impartial decisionmaker.

[21] We do not agree, however, with the Seventh Circuit that a full-dress administrative hearing, with evidentiary safeguards, is part of the "constitutional minimum." Indeed, we think that an expeditious arbitration might satisfy the requirement of a reasonably prompt decision by an impartial decisionmaker, so long as the arbitrator's selection did not represent the Union's unrestricted choice. In contrast to the Union's procedure here, selection of an arbitrator frequently does not represent one party's unrestricted choice from a list of state-approved arbitrators. See F. Elkouri & E. Elkouri, How Arbitration Works 135–137 (4th ed. 1985); O. Fairweather, Practice and Procedure in Labor Arbitration 79–90 (2d ed. 1981).

The arbitrator's decision would not receive preclusive effect in any subsequent § 1983 action. See *McDonald* v. *West Branch,* 466 U. S. 284 (1984).

Thus, the original Union procedure was inadequate because it failed to minimize the risk that nonunion employees' contributions might be used for impermissible purposes, because it failed to provide adequate justification for the advance reduction of dues, and because it failed to offer a reasonably prompt decision by an impartial decisionmaker.

## V

The Union has not only created an escrow of 100% of the contributions exacted from the respondents, but has also advised us that it would not object to the entry of a judgment compelling it to maintain an escrow system in the future. The Union does not contend that its escrow has made the case moot. Rather, it takes the position that because a 100% escrow completely avoids the risk that dissenters' contributions could be used improperly, it eliminates any valid constitutional objection to the procedure and thereby provides an adequate remedy in this case. We reject this argument.

Although the Union's self-imposed remedy eliminates the risk that nonunion employees' contributions may be temporarily used for impermissible purposes, the procedure remains flawed in two respects. It does not provide an adequate explanation for the advance reduction of dues, and it does not provide a reasonably prompt decision by an impartial decisionmaker. We reiterate that these characteristics are required because the agency shop itself impinges on the nonunion employees' First Amendment interests, and because the nonunion employee has the burden of objection. The appropriately justified advance reduction and the prompt, impartial decisionmaker are necessary to minimize both the impingement and the burden.[22]

---

[22] In view of the fact that plaintiffs established a constitutional violation, moreover, the task of fashioning a proper remedy is one that should be performed by the District Court after all interested parties have had an opportunity to be heard. The judicial remedy for a proven violation of law will often include commands that the law does not impose on the community at

We need not hold, however, that a 100% escrow is constitutionally required. Such a remedy has the serious defect of depriving the Union of access to some escrowed funds that it is unquestionably entitled to retain. If, for example, the original disclosure by the Union had included a certified public accountant's verified breakdown of expenditures, including some categories that no dissenter could reasonably challenge, there would be no reason to escrow the portion of the nonmember's fees that would be represented by those categories.[23] On the record before us, there is no reason to believe that anything approaching a 100% "cushion" to cover the possibility of mathematical errors would be constitutionally required. Nor can we decide how the proper contribution that might be made by an independent audit, in advance, coupled with adequate notice, might reduce the size of any appropriate escrow.

Thus, the Union's 100% escrow does not cure all of the problems in the original procedure. Two of the three flaws remain, and the procedure therefore continues to provide less than the Constitution requires in this context.

## VI

We hold today that the constitutional requirements for the Union's collection of agency fees include an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending.

The determination of the appropriate remedy in this case is a matter that should be addressed in the first instance by the District Court. The Court of Appeals correctly reversed the

large. See *National Society of Professional Engineers* v. *United States,* 435 U. S. 679, 697–698 (1978); *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1, 15–16 (1971).

[23] If the Union chooses to escrow less than the entire amount, however, it must carefully justify the limited escrow on the basis of the independent audit, and the escrow figure must itself be independently verified.

District Court's original judgment and remanded the case for further proceedings. That judgment of reversal is affirmed, and those further proceedings should be consistent with this opinion.

*It is so ordered.*

JUSTICE WHITE, with whom the THE CHIEF JUSTICE joins, concurring.

I join the opinion and judgment of the Court with the following observations. First, since the Court, as did Judge Flaum in the Court of Appeals, deems it unnecessary to reach the issue of nongermane, nonideological expenditures, the panel's remarks on the subject are therefore obvious dicta. Under our cases, they are also very questionable.

Second, as I understand the Court's opinion, the complaining nonmember need only complain; he need not exhaust internal union hearing procedures, if any, before going to arbitration. However, if the union provides for arbitration and complies with the other requirements specified in our opinion, it should be entitled to insist that the arbitration procedure be exhausted before resorting to the courts.