Judith **LIEGMANN**, et al., Plaintiffs,

v.

**CALIFORNIA TEACHERS ASSOCIATION, et al.,** Defendants.

No. C 05–03828JW.

United States District Court, N.D. California. San Jose Division.

Oct. 7, 2005.

---

Milton L. Chappell, Steven Burlingham, CA, for Plaintiffs.

Beverly Tucker, Diane Lee Ross, Burlingame, CA, Jeffrey B. Demain, Jonathan Weissglass, Peder Thoreen, San Francisco, CA, Priscilla Sue Winslow, Bulingame, CA, Stephen P. Berzon, San Francisco, CA, Bernhard Rohrbacher, Glenn Rothner, Pasadena, CA, for Defendants.

## ORDER DENYING PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

WARE, District Judge.

## I. INTRODUCTION

Presently before the Court is an ex parte application for a temporary restraining order ("TRO") filed by six California teachers and professors ("Plaintiffs") purporting to represent a class of all individuals who pay dues or fees to the California Teachers Association ("CTA") and California Faculty Association ("CFA"), (collectively "Defendants"). Plaintiffs allege that the CTA and CFA are using a recently enacted increase in dues and fees for political purposes, and request a TRO to require Defendants to place in escrow the amount collected in the increase from members of the CTA and nonmembers of the CFA. The Court sought preliminary briefing regarding the TRO and held a hearing on October 5, 2005. After considering the arguments presented in the briefing and presented by counsel at the hearing, Plaintiffs' application for a TRO is DENIED.

## II. BACKGROUND

Plaintiffs are a group of six California teachers and professors who pay dues or fees to the Defendants CTA and CFA. The CTA is a teachers union that represents K–12, community college, and California State University teachers in California. In addition to representing teachers in its 1,100 local affiliates at the collective bargaining table, in grievances and arbitrations, and in litigation before courts and administrative agencies, the CTA has also historically engaged in political activities affecting issues which it believes impact teachers. The CFA is an affiliated union which represents faculty in the California system of higher education.

By statute, the CTA and CFA act as the exclusive bargaining representative of faculty in California schools and colleges, and may impose compulsory union dues or fees. These dues and fees appear to be directly deducted from teachers' paychecks. For the CTA, the compulsory fees for nonmembers are equal to the amount of member dues unless a nonmem-

ber objects to the use of her fees for "non-chargeable activities"—those activities not directly related to the union's bargaining activities. Unlike the CTA, the CFA does not require nonmembers to object in order to pay a reduced fee; nonmembers are automatically charged a reduced "fair share fee." For the CFA, the percentage of the full member dues that a nonmember must pay in her fair share fee is currently about 70%.

Earlier this year, the CTA and CFA implemented an increase in the amount of money deducted from teachers' paychecks. This increase, in whole or in part, may be spent for political purposes. Specifically, Plaintiffs contest the use of their increase in dues for defeating the November 8, 2005 ballot initiatives, and taking other political and non-bargaining actions. To this end, Plaintiffs filed an application for a TRO on September 28, 2005 to place in escrow the increase in dues and fees collected from nonmembers of the CFA and members of the CTA.[1]

## III. STANDARDS

■ Like other types of preliminary injunctions, a temporary restraining order may be issued if the plaintiff has established: (1) a likelihood of success on the merits and the possibility of immediate irreparable injury, or (2) the existence of serious questions going to the merits and that the balance of hardships tips heavily in its favor. *See Metro Publishing, Ltd. v. San Jose Mercury News,* 987 F.2d 637, 639 (9th Cir.1993); *see also Southwest Voter Registration Education Project v. Shelley,* 344 F.3d 914 (9th Cir.2003) (en banc) (citations omitted). The two components of this test sit on a "continuum," *Southwest*

*Voter,* 344 F.3d at 918; thus, "the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor." *Id.See also Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc.,* 762 F.2d 1374, 1377 (9th Cir. 1985) (noting that the two prongs "represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases"). Under any articulation of the relevant test, to justify the grant of injunctive relief a plaintiff must show a "significant threat of irreparable injury, irrespective of the magnitude of the injury." *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1397 n. 1 (9th Cir.1997).

## IV. DISCUSSION

### A. The Balance of Hardships

■ The hardships at issue are infringement of First Amendment rights and the potential for monetary damage to the parties. Plaintiffs argue that a use of the increase in dues for political purposes that they oppose, even for a short while, causes irreparable harm by infringing their First Amendment rights. The Supreme Court has recognized a First Amendment right in preventing compulsory contributions to unions from being used as an involuntary loan for impermissible purposes. *Ellis v. Brotherhood of Railway, Airline, and Steamship Clerks, Freight Handlers, Express and Station Employees,* 466 U.S. 435, 444, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984). However, even aside from evaluating the merits of

---

1. According to Plaintiffs' counsel at the October 5, 2005 hearing, Plaintiffs have voluntarily limited their request for a TRO to place in escrow the increase in fees and dues collected from nonmembers of the CFA and members of the CTA based on conversations with Defendants.

Plaintiffs' claim, Plaintiffs fail to recognize that the First Amendment also applies to unions and non-objecting members and nonmembers. *See Kidwell v. Transp. Comm. Int'l Union*, 946 F.2d 283, 297 (4th Cir.1991) (holding that a "union's First Amendment right of expressive association" precludes a right to object for union members). Plaintiffs' TRO would place in escrow the entire increase collected from CFA nonmembers and CTA members regardless of whether the individuals actually objected to the use by Defendants of the increase in dues and fees collected. Casting such a wide net is disfavored by the law in this Circuit: "Plaintiff's proposed rule—that dissent could be presumed, as a protection to the uninformed nonmembers—would fail to respect the fee payers' First Amendment rights as running both ways." *Wagner v. Prof. Eng'rs. in Cal. Gov't*, 354 F.3d 1036 (9th Cir.2004) (holding that an automatic refund to every nonmember fee payer whether or not the payer objected violates the First Amendment rights of the non-objecting fee payer). In light of the countervailing constitutional rights of the union and non-objectors, Plaintiffs have not made a sufficient showing that the balance of hardships on the issue of constitutional rights favors the issuance of a TRO.

As to the potential financial damage, Plaintiffs acknowledge that the amount of the increase deducted from their paychecks is small in monetary terms, but Plaintiffs contend that the monetary rights of Defendants are only momentarily delayed. The CTA responds that there is a serious risk that a TRO would cause or destroy the CTA's ability to obtain a $40 million line of credit, which the CTA is currently in the process of negotiating. (Moreno Decl. ¶ 5). Absent a sufficient showing by the Plaintiffs that the balance of constitutional and monetary hardships

tips sharply in their favor, this Court turns to the merits of Plaintiffs' claim.

B.  Likelihood of Success on the Merits

1.  *Nonmembers Paying Compulsory Agency Fees to the CFA.*

In order to prevent "compulsory subsidization of ideological activity by employees who object thereto without restricting the Union's ability to require every employee to contribute to the cost of collective-bargaining activities," the Supreme Court in *Chicago Teachers Union Local No. 1, v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986) requires that unions give nonmembers notice to "minimize the risk that nonunion employees' contributions might be used for impermissible purposes...provide adequate justification for the advance reduction of dues, and...offer a reasonably prompt decision by an impartial decisionmaker." *Id.* at 309, 106 S.Ct. 1066 (hereinafter *"Hudson* Notice"). Plaintiffs contend that the CFA did not provide adequate notice to its nonmembers because the *Hudson* Notices were issued prior to the fee increase and thus did not mention the increase in fees.

■ The CFA agrees that it did not issue a *Hudson* Notice following the increase in fees, but contends that it is not constitutionally required to do so. This Court agrees. The CFA fiscal year runs from September 1 to August 31. On the basis of an audit of its expenditures for each complete fiscal year, the CFA calculates the percentage of dues chargeable to fair share fee payers. Each January it send the fee payers its *Hudson* Notice, informing them of the chargeable percentage of this year's dues based on the prior year's audit, currently about 70%. The increase at issue in the fair share fee for nonmembers is also about 70% of the increase in membership dues charged to members. In other words, the CFA's ac-

counting procedure involves calculating the percentage of dues chargeable to fair share fee payers on the basis of the prior year's expenditure data rather than the current year's revenue. The Supreme Court in *Hudson* expressly found that such a procedure for calculating the reduced fair share fee is permissible for Constitutional purposes: "We continue to recognize that there are practical reasons why '[a]bsolute precision' in the calculation of the charge to nonmembers cannot be 'expected or required.' Thus, for instance, the Union cannot be faulted for calculating its fee on the basis of its expenses during the preceding year." *Id.* at 307 n. 18, 106 S.Ct. 1066 (citations omitted). This District has interpreted and applied *Hudson* accordingly: "Recognizing the difficulty in requiring exact figures from a union engaging in on-going operations, the Court permitted the union to extrapolate from prior fiscal year data as the basis for future charges." *Laramie v. County of Santa Clara,* 784 F.Supp. 1492, 1496 (N.D.Cal. 1992).

The CFA's *Hudson* Notice in January 2005 containing audited figures of the prior year's chargeable and nonchargeable expenditures meets the requirements of *Hudson.* The audited statements in the *Hudson* Notice detail the amount of each expenditure and the percentages of each expenditure which is chargeable and nonchargeable. (CFA *Hudson* Notice, Chapelle Decl., Exh. U.) This Court declines to find nonmembers are further entitled to another *Hudson* Notice, in advance, detailing exactly how much of the additional revenue generated by a fee increase will be spent on which purpose. There is nothing in *Hudson* or subsequent authority which requires that *Hudson* Notices provide such advance detail.

■ Furthermore, this Court declines to find that the present increase is so

extraordinary that it requires a departure from the procedure approved in *Hudson.* In this case, Plaintiffs allege that to raise funding for these planned political activities, the CTA increased their member dues by $6.00/month based on a ten-month cycle beginning with the September 30, 2005 paycheck and the CFA increased nonmember fees by $2.63 to $5.25 (based on salary) per month beginning with the July 1, 2005 paycheck. Such an increase, an increase in dues of about 10%, is not so extraordinary as to warrant departure from the *Hudson*-sanctioned customary approach. Plaintiffs have failed to make an sufficient showing on the merits to support a TRO requiring the CFA to place in escrow the increase in fees collected from CFA nonmembers.

### 2. *CTA Members Paying Membership Dues to the CTA.*

■ The weight of the law indicates that a class of union members challenging the expenditure of union dues for political activity is also unlikely to succeed on the merits. *See, e.g., Kidwell,* 946 F.2d 283. In *Kidwell,* the Fourth Circuit directly addressed the question of whether a member of a union in an agency shop has a right under the First Amendment to pay less than full dues when the member objects to use of the dues for political purposes. The Fourth Circuit found that the First Amendment does not mandate a right to object for union members in an agency shop, and that such a right to object would infringe on the union's First Amendment right of expressive association. *Id.* at 297. This Court finds the reasoning of the Fourth Circuit in *Kidwell* persuasive.

Although the Ninth Circuit has not expressly addressed the issue of whether union members have a First Amendment right to object to the use of their member

fees for political purposes, this District has adopted the relevant holding in *Kidwell. See Farrell v. International Ass'n of Firefighters Local 55*, 781 F.Supp. 647, 649 (N.D.Cal.1992). In *Farrell*, a group of firefighters sought a preliminary injunction against the use of union dues for litigation which they found ideologically offensive. Even though firefighters who chose to opt out were required to pay an agency fee provision, the court held that the payment of the agency fee did not amount to compulsion to join the union. Citing *Kidwell* as authority, the court rejected the plaintiffs' First Amendment claim: "Essentially plaintiffs assert a First Amendment right to participate in the union without financing causes with which they disagree. Plaintiffs do not have that right. Indeed, the union's First Amendment right to associate appears to outweigh any rights plaintiffs have to membership. If plaintiffs wish to participate in every aspect of union decision-making, they must join the union and accept the will of the majority." *Id.* (citations omitted).

■ At oral argument, Plaintiffs argued that the constitutional violation for which they now seek to address by requesting a TRO is the failure of the CTA to give a *Hudson* Notice to its members alerting its members of their option to resign. As support, Plaintiffs rely on a line in *Hudson* which requires that notice be given to "potential objectors." *Hudson*, 475 U.S. at 306, 106 S.Ct. 1066. The full paragraph, however reads:

> Basic considerations of fairness, as well as concern for the First Amendment rights at stake, also dictate that the potential objectors be given sufficient information to gauge the propriety of the union's fee. *Leaving the nonunion employees in the dark* about the source of the figure for the agency fee—and

requiring them to object in order to receive information—does not adequately protect the careful distinctions drawn in Abood.

*Id.* (emphasis added). In context, the Supreme Court's reference to "potential objectors" does not mean any union member who may decide to resign and then object as a nonmember, but simply refers to nonmembers who could be objectors. Such an interpretation reconciles the holding of *Hudson* with recent interpretations of the *Hudson* requirements in cases such as *Kidwell* and *Farrell* because only the objections of nonmembers bear any legal significance. Thus, contrary to Plaintiffs' assertions, neither *Hudson* nor its progeny require notices to union members informing them of their right to resign at each dues or fees increase.

■ In short, as to the Plaintiffs who are members of the CTA, this Court finds only that the union members objecting to the use of their member fees for political purposes retain the right to be non-members. But, contrary to Plaintiffs' argument, CTA members does not have the right to veto the use of their dues to finance any particular expenditure. Accordingly, the TRO requested to place the increase in dues collected from CTA members is also denied.

## V. CONCLUSION

For the reasons above, Plaintiffs' application for a TRO is DENIED.