Justice Sotomayor,
with whom Justice Ginsburg joins, concurring in the judgment.
When a public-sector union imposes a special assessment intended to fund solely political lobbying efforts, the First Amendment requires that the union provide nonmembers an opportunity to opt out of the contribution of funds. I therefore concur in the Court’s judgment.
I concur only in the judgment, however, because I cannot agree with the majority’s decision to address unnecessarily significant constitutional issues well outside the scope of the questions presented and briefing. By doing so, the majority breaks our own rules and, more importantly, disregards principles of judicial restraint that define the Court’s proper role in our system of separated powers.
I—I
The Political Fight-Back Fund was to be used by Service Employees International Union, Local 1000 (SEIU), “specifically in the political arenas of California” to defeat perceived antiunion initiatives and to elect a sympathetic Governor and legislature. App. 25; see also id., at 31. As the majority explains, such political efforts are not “ger *324 mane” to the union’s function as a bargaining representative, and accordingly are not chargeable to objecting nonmembers. See Lehnert v. Ferris Faculty Assn., 500 U. S. 507, 519 (1991); see also Locke v. Karass, 555 U. S. 207, 211 (2009) (“[N]onchargeable union activities [include] political, public relations, or lobbying activities”). While the union is free to pursue its ideological goals in the political arena, it may not subsidize its efforts with objecting nonmembers’ funds, lest the objector be used as “‘an instrument for fostering public adherence to an ideological point of view he finds unacceptable.’” Lehnert, 500 U. S., at 522 (plurality opinion) (quoting Wooley v. Maynard, 430 U. S. 705, 715 (1977)).
Accordingly, when a union levies a special assessment or dues increase to fund political activities, the union may not collect funds from nonmembers who earlier had objected to the payment of nonchargeable expenses, and may not collect funds from other nonmembers without providing a new Hudson notice and opportunity to opt out. See Teachers v. Hudson, 475 U. S. 292 (1986). Because SEIU failed to follow these procedures, it did not satisfy its constitutional obligations. That holding should end this case; it is all petitioners asked this Court to decide.[1]
hH >—<
The majority agrees that SEIU’s actions were at odds with the First Amendment. Yet it proceeds, quite unnecessarily, to reach significant constitutional issues not contained in the questions presented, briefed, or argued. Petitioners *325 did not question the validity of our precedents, which consistently have recognized that an opt-out system of fee collection comports with the Constitution. See Davenport v. Washington Ed. Assn., 551 U. S. 177, 181, 185 (2007); Hudson, 475 U. S., at 306, n. 16; Abood v. Detroit Bd. of Ed., 431 U. S. 209, 238 (1977); see also ante, at 312-314. They did not argue that the Constitution requires an opt-in system of fee collection in the context of special assessments or dues increases or, indeed, in any context. Not surprisingly, respondent did not address such a prospect.
Under this Court’s Rule 14.1(a), “[o]nly the questions set out in the petition, or fairly included therein, will be considered by the Court.” “[W]e disregard [that rule] ‘only in the most exceptional cases,’ where reasons of urgency or economy suggest the need to address the unpresented question in the case under consideration.” Yee v. Escondido, 503 U. S. 519, 535 (1992) (quoting Stone v. Powell, 428 U. S. 465, 481, n. 15 (1976)). The majority does not claim any such exceptional circumstance here. Yet it reaches out to hold that “when a public-sector union imposes a special assessment or dues increase, the union must provide a fresh Hudson notice and may not exact any funds from nonmembers without their affirmative consent.” Ante, at 322 (emphasis added); see also ante, at 317 (“[T]he union should have sent out a new notice allowing nonmembers to opt in to the special fee rather than requiring them to opt out”). The majority thus decides, for the very first time, that the First Amendment does require an opt-in system in some circumstances: the levying of a special assessment or dues increase. The majority announces its novel rule without any analysis of potential countervailing arguments and without any reflection on the reliance interests our old rules have engendered.
The majority’s choice to reach an issue not presented by the parties, briefed, or argued, disregards our rules. See Yee, 503 U. S., at 535. And it ignores a fundamental premise *326 of our adversarial system: “ ‘that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.’” NASA v. Nelson, 562 U. S. 134, 147, n. 10 (2011) (opinion for the Court by Alito, J.) (quoting Carducci v. Regan, 714 P. 2d 171, 177 (CADC 1983) (opinion for the court by Scalia, J.)); see also Jefferson v. Upton, 560 U. S. 284, 301 (2010) (Scalia, J., joined by Thomas, J., dissenting) (The majority’s “refusal to abide by standard rules of appellate practice is unfair to the . . . Circuit,” which did not pass on this question, “and especially to the respondent here, who suffers a loss in this Court without ever having an opportunity to address the merits of the . . . question the Court decides”). The imperative of judicial restraint is at its zenith here, with respect to an issue of such constitutional magnitude, for “[i]f there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable.” Clinton v. Jones, 520 U. S. 681, 690, n. 11 (1997) (internal quotation marks omitted).[2]
*327 To make matters worse, the majority’s answer to its unasked constitutional question is not even clear. After today, must a union undertaking a special assessment or dues increase obtain affirmative consent to collect “any funds” or solely to collect funds for nonchargeable expenses? May a nonmember opt not to contribute to a special assessment, even if the assessment is levied to fund uncontestably chargeable activities? Does the majority’s new rule allow for any distinction between nonmembers who had earlier objected to the payment of nonchargeable expenses and those who had not? What procedures govern this new world of fee collection?
Moreover, while the majority’s novel rule is, on its face, limited to special assessments and dues increases, the majority strongly hints that this line may not long endure. The majority pronounces the Court’s explicit holding in Machinists v. Street, 367 U. S. 740, 774 (1961)—that “dissent is not to be presumed[,] it must affirmatively be made known to the union by the dissenting employee”—nothing but an “offhand remark,” made by Justices who did not “pause to consider the broader constitutional implications of an affirmative opt-out requirement,” ante, at 313. The reader is told that our precedents’ “acceptance of the opt-out approach appears to have come about more as a historical accident than through the careful application of First Amendment principles.” Ante, at 312. And that “[b]y authorizing a union to collect fees from nonmembers and permitting the use of an opt-out system for the collection of fees levied to cover non *328 chargeable expenses, our prior decisions approach, if they do not cross, the limit of what the First Amendment can tolerate.” Ante, at 314 (emphasis added); see also ante, at 321 (“[B]y allowing unions to collect any fees from nonmembers and by permitting unions to use opt-out rather than opt-in schemes when annual dues are billed, our cases have substantially impinged upon the First Amendment rights of nonmembers”); ante, at 312 (“Once it is recognized . . . that a nonmember cannot be forced to fund a union’s political or ideological activities, what is the justification for putting the burden on the nonmember to opt out of making such a payment? Shouldn’t the default rule comport with the probable preferences of most nonmembers?”).
To cast serious doubt on longstanding precedent is a step we historically take only with the greatest caution and reticence. To do so, as the majority does, on our own invitation and without adversarial presentation is both unfair and unwise. It deprives the parties and potential amici of the opportunity to brief and argue the question. It deprives us of the benefit of argument that the parties, with concrete interests in the question, are surely better positioned than we to set forth. See NASA, 562 U. S., at 147, n. 10 (opinion for the Court by Alito, J.) (“It is undesirable for us to decide a matter of this importance in a case in which we do not have the benefit of briefing by the parties and in which potential amici had little notice that the matter might be decided”). Not content with our task, prescribed by Article III, of answering constitutional questions, the majority today decides to ask them as well.

 See Pet. for Cert, (i) (questions presented); Brief for Petitioners (i) (same); id., at 39 (“The Court should hold that. . . when a union imposes a forced-fee increase primarily or solely for political purposes between notices, it may not collect the increase from nonmembers who have already objected, and it must not collect the increase from other nonmembers until it has ascertained their wishes by providing them with a new notice about the increase’s purpose and an opportunity to opt out”); see also App. 18-19 (complaint).

 The majority contends that its holding “does not venture beyond the scope of the questions on which we granted review,” pointing to the second question presented. Ante, at 322, n. 9. The majority is mistaken. That question concerns the chargeability of political and lobbying activities under Lehnert v. Ferris Faculty Assn., 500 U. S. 507, 522 (1991), not the procedures by which a union may collect fees. See Pet. for Cert. (i); id., at 20-27 (describing scope of second question presented); id., at 23 (“There is a serious split, and confusion, among the circuits on the chargeability of union political and lobbying activities”). Indeed, it is only petitioners’ first question presented that deals with fee-collection procedures. And in that question, petitioners ask this Court to hold that SEIU may not collect its special assessment without providing a Hudson notice that offers “an opportunity to object to” the deduction of fees for the assessment. Pet. for Cert. (i) (emphasis added).
The phrase “opt in” appears not once in petitioners’ briefing. The majority protests that it cannot but hold that an opt-in regime is required, seeing as the opt-out regime the petitioners advocate is, in the majority’s *327 view, unconstitutional. But if the Court was dissatisfied with the scope of the questions presented here it should not have granted certiorari in this case. Or having granted it, the Court should have asked for supplemental briefing on the question whether an opt-in regime is constitutionally required. What it should not have done—cannot do under our rules—is decide that question without having provided the parties and potential amici an opportunity to weigh in with their own considered views.