69 N.Y.2d 265 (1986)
In the Matter of Joseph Cahill, Respondent,
v.
Public Service Commission et al., Appellants, and Central Hudson Gas and Electric Corporation, Intervenor-Appellant.
Court of Appeals of the State of New York.
Argued November 12, 1986.
Decided December 19, 1986.
David E. Blabey, Lawrence G. Malone and Leonard Van Ryn for Public Service Commission, appellant.
John M. Clarke, Gerald M. Oscar and Thomas J. Farrelly for New York Telephone Company, appellant.
Walter A. Bossert, Jr., Davison W. Grant and Thomas C. Hutton for intervenor-appellant.
Richard Emery for respondent.
Judges MEYER, SIMONS, KAYE and ALEXANDER concur with Judge HANCOCK, JR.; Judge TITONE dissents and votes to reverse in a separate opinion in which Chief Judge WACHTLER concurs.
*268 HANCOCK, JR., J.
We hold that acts of the New York State Public Service Commission (PSC) in setting rates which compel a utility customer to pay for charitable contributions made by the utility constitute governmental conduct giving rise to a cognizable claim by that customer that his rights under the First Amendment of the United States Constitution have been violated.

I
In a CPLR article 78 proceeding against the PSC and New York Telephone Company (New York Tel.), petitioner, a customer of New York Tel., seeks to annul two actions of the PSC:
(1) The policy adopted by the PSC in 1970 whereby charitable contributions by utilities are allowed as "proper operating expenses" (New York Tel. Co., case 25155, 10 NY PSC 345, 378, 84 PUR3d 321, 349 [July 1, 1970])[1] and

*269 (2) The PSC "Opinion and Order Determining Revenue Requirement and Rate Structure" dated June 22, 1984 (opinion No. 84-16) specifically authorizing New York Tel. to charge its ratepayers, including petitioner, for charitable donations of approximately $3,000,000 in 1984, and establishing rates to be paid by customers for service which are based on the inclusion of these contributions as operating costs.
Petitioner, a Catholic, alleges that as a consequence of the PSC policy and rate order he is compelled to contribute to "religious institutions" espousing beliefs inconsistent with his own, to charities supporting "the right to an abortion" contrary to his "moral and religious" beliefs and to causes which he finds objectionable on "personal and political grounds". "No matter how small a portion of his bill is affected", he says, he opposes these contributions "as a matter of principle" and he asserts that the PSC has denied him his constitutional rights under the free speech, free exercise and establishment clauses of the First Amendment of the Federal Constitution, citing Abood v Detroit Bd. of Educ. (431 US 209).
In lieu of answering the petition, respondents[2] moved to dismiss (CPLR 7804 [f]; 3211 [a] [7]) contending, among other things, that the utilities' actions in passing along the cost of charitable contributions were essentially private decisions and that the government's limited involvement was an insufficient basis for finding a violation of petitioner's First Amendment rights, citing Jackson v Metropolitan Edison Co. (419 US 345) and Blum v Yaretsky (457 US 991). Special Term rejected respondents' arguments (128 Misc 2d 510) and the Appellate Division, with a divided court, affirmed, holding that petitioner had adequately stated a "threshold claim of `State action'" by "alleging that the PSC adopted a policy which permitted the costs of charitable donations to be passed along to ratepayers" (113 AD2d 603, 606). The dissenters found that this case fell "squarely under" Blum and Jackson and that petitioner had failed to allege a sufficient nexus between the challenged acts and the State (id., at p 609).
The Appellate Division granted respondents permission to appeal to our court and certified the following question: "Did *270 this court err, as a matter of law, in affirming Special Term's order which denied respondents' motions to dismiss the petition?" For reasons which will appear, we hold that the question should be answered in the negative and that the order of the Appellate Division affirmed.

II
The critical issue is whether petitioner's CPLR article 78 proceeding involves private conduct of a utility in which the State has merely acquiesced, as respondents and the dissenters contend, or governmental conduct of an agency of the State itself. Because it involves the latter we hold that under the controlling authority of Abood v Detroit Bd. of Educ. (431 US 209, supra) the petition states a cognizable claim that the 1970 policy decision and the 1984 rate order of the PSC violate petitioner's rights under the First and Fourteenth Amendments of the United States Constitution. In Abood, plaintiffs, nonunion teachers, challenged the validity of a union shop clause in the collective bargaining agreement between their employer and the teachers' union because dues they were compelled to pay were being used by the union for legislative lobbying and for the support of political candidates. The Supreme Court, in holding that plaintiffs' rights were infringed by being forced to pay a portion of these contributions under threat of loss of their jobs, stated (at pp 235-236):
"[T]he freedom of belief is no incidental or secondary aspect of the First Amendment's protections:
"`If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.' West Virginia Bd. of Ed. v. Barnette, 319 U.S. 624, 642.
"These principles prohibit a State from compelling any individual to affirm his belief in God, Torcaso v. Watkins, 367 U.S. 488, or to associate with a political party, Elrod v. Burns, supra; see 427 U.S., at 363-364, n. 17, as a condition of retaining public employment.
* * *
"We do not hold that a union cannot constitutionally spend funds for the expression of political views, on behalf of political *271 candidates, or toward the advancement of other ideological causes not germane to its duties as collective-bargaining representative. Rather, the Constitution requires only that such expenditures be financed from charges, dues, or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of governmental employment." (Emphasis added.)
There is no basis for distinguishing Abood. The acts giving rise to the claims here and in Abood were not the private decisions of the utilities and the union to make charitable and political contributions but the governmental actions in compelling the utility customer here and the nonunion teachers in Abood to pay for them. In Abood the coercion came from the State-sanctioned union shop clause under which nonunion members could be discharged for nonpayment. In this proceeding, the coercion results from the fact that the State establishes the rate that the customer must pay and the rate includes an allowance for the objected to contributions. Because the utility is a monopoly the customer must pay or be deprived of his right to utility service.
The dissent points to no difference between the coercive effect of the PSC rate directives and the coercive effect of the union shop clause in Abood. Instead, for purposes of its argument, it constructs a model of a utility which omits the utility's distinguishing characteristic as a legalized monopoly  public control. The dissent then analyzes the utility's behavior "without any governmental intervention at all" (dissenting opn, at pp 278-279) as though it were a private company and readily concludes that "utility companies, like most unregulated business concerns, would simply include in the price for their services the cost of whatever charitable donations they might choose to make", and that "the PSC has done no more than merely refuse to interfere with what is essentially a private decision." (Dissenting opn, at p 279.) To reach these conclusions, it must be emphasized, the dissent has assumed the validity of two propositions: that "the regulatory powers of the State [are] not involved in the rate-setting process" (dissenting opn, at p 279) and that the charitable contributions reflected in the rates are "charges in which the PSC has, in the truest sense of the word, merely `acquiesced'" (dissenting opn, at p 278). But these assumptions find no support in law or fact.
A public utility is franchised by the State (Public Service Law §§ 68, 99) to provide services to the public at just and *272 reasonable rates (Public Service Law §§ 65, 91) in exchange for a proper return on its investment (see, Public Service Law § 97; Matter of Village of Boonville v Maltbie, 272 N.Y. 40). Operating as a monopoly (see, People ex rel. New York Edison Co. v Willcox, 207 N.Y. 86, 93-94), it is subject to regulation by the PSC (Public Service Law §§ 66, 94). The PSC oversees the utilities for the public good as an exercise of the State's police powers (People ex rel. New York Elec. Lines Co. v Squire, 145 US 175) and has exclusive authority to determine just and reasonable rates (Public Service Law § 66 [12]; § 92 [2]). It establishes maximum rates which may not be exceeded (Public Service Law § 65 [1]; § 91 [1]). In fact, no utility may charge more or less than the rates established by the PSC (see, Public Service Law § 66 [12]; § 92 [2]).
Aside from the fallacy of comparing a public utility to a private company because of the utility's uniquely public character, the analogy which the dissent draws to the decisions of corporate officials of a private company in making charitable contributions (dissenting opn, at p 279) cannot stand for a more basic reason. What is at issue here is not the conduct of the utility officials, but the policy and directives of the PSC in establishing utility rates which include charitable contributions as operating expenses. And in any event the effect of a decision of a private corporation to pass through to its customers the costs of charitable contributions simply cannot be compared with the action of the PSC in setting utility rates which include such contributions. In the case of a private corporation a customer who disapproves has a voice  he may decide not to buy the product. In the case of a utility the customer has no voice  the contribution is locked into the rate approved by the PSC, and the customer must pay or go without service.
For the same basic reason  that this proceeding challenges the public conduct of the PSC and not the private conduct of the utilities  Jackson v Metropolitan Edison Co. (419 US 345, supra) and Blum v Yaretsky (457 US 991, supra) are inapplicable. In Jackson the suit was against the utility and not the Pennsylvania Utility Commission. The basis of the lawsuit was solely the private act of the utility in shutting off electric service, and the court simply dismissed plaintiff's arguments that that private conduct should be attributed to the State merely because of its role in regulating the utility and in approving the regulations under which the termination was effected. Similarly, in Blum the actions which the nursing *273 home patients sought to attribute to the State were decisions made by "utilization review committees" of private nursing homes to transfer patients to facilities providing less intensive medical care. The court held that these committee decisions did not become State action solely because the nursing homes were subject to State regulation and the State responded to the decisions by adjusting the patients' Medicaid benefits.
To bring the case within Jackson and Blum, the dissent, referring to the PSC's brief (dissenting opn, at p 278), minimizes the function of the PSC in rate setting and characterizes its role as little more than passive acquiescence. Such a narrow view of the PSC's function, as already noted, is at odds with the broad grant of rate-setting authority vested in the PSC by the Legislature (Public Service Law §§ 66, 72, 91). It also runs counter to our own decisions holding that the function of rate setting is left to the discretion of the Public Service Commission, and that so long as rates are just and reasonable, they may not be set aside (see, Matter of Abrams v Public Serv. Commn., 67 N.Y.2d 205, 211-212; Matter of New York State Council of Retail Merchants v Public Serv. Commn., 45 N.Y.2d 661).
As to petitioner, a customer who must purchase service from a public utility at rates established by the State, the combined effect of the utility's monopoly status and the rate order is no less coercive than the threat of employment loss in Abood.[3] Like plaintiffs, who had a right to hold their jobs in Abood, petitioner, a member of the public in the utility's franchised area, has an unquestioned legal right to utility service (Public Service Law §§ 65, 91). Like the plaintiffs in Abood, he must forego that right or be subject to the "compulsory subsidization of ideological activity" condemned in Abood (431 US, at p 237) and its progeny (see, Teachers v Hudson, 475 US 292, 106 S Ct 1066; Ellis v Railway Clerks, 466 US 435; Galda v Bloustein, 686 F.2d 159). That petitioner's proportionate share of the objected to contributions *274 is small is of no moment, "[f]or, whatever the amount, the quality of [petitioner's] interest in not being compelled to subsidize the propagation of political or ideological views that [he] oppose[s] is clear" (Teachers v Hudson, 475 US, at p ___, 106 S Ct, at p 1075).[4] To petitioner Cahill one salient fact remains: he is compelled to support institutions he opposes on moral and religious grounds because he must subscribe to the utility and pay rates based, in part, on those contributions, or be deprived of his right to electric and telephone service.
We address only the question certified by the Appellate Division. The respondents' remaining contentions, that the petition should be dismissed due to petitioner's failure to exhaust administrative remedies, that the petition was not timely commenced, and that petitioner lacked standing to bring the proceeding are not before us. The certified question should be answered in the negative and the order of the Appellate Division should be affirmed, with costs.
TITONE, J. (dissenting).
Petitioner commenced this proceeding to challenge a decision of the Public Service Commission (PSC) that allows utility companies to pass along a portion of the cost of their charitable donations to their ratepayers. His challenge is based on the claim that the decision impairs petitioner's and other ratepayers' Federal First Amendment rights to freedom of expression and worship by requiring them to contribute indirectly to charitable groups espousing views antithetical to their own. However we may feel about the wisdom of the PSC's policy, we conclude that the State's regulatory involvement in the cost pass-along that petitioner finds offensive is an insufficient basis for finding that his rights have been impaired by the actions of a governmental entity. Accordingly, we dissent and vote to reverse the Appellate Division order.
The Public Service Commission decision that is challenged here was actually made in 1970. Prior to 1970, the PSC exercised its regulatory authority over utility rates by requiring *275 the utilities' shareholders to absorb the cost of charitable contributions rather than passing those costs along to the consumer in the form of increased prices for utility service. The PSC rescinded this policy in 1970 and replaced it with a ruling allowing utilities to recover from ratepayers a portion of their charitable contribution costs calculated by a formula based on the individual utility's adjusted pre-1970 level of expenditure (New York Tel. Co., case 25155, 10 NY PSC 345, 84 PUR3d 321, 349-350). This change in policy reflected the PSC's view that charitable contributions can be a legitimate business expense that ought to be recognized as a form of overhead. In its ruling, the PSC stated that "it is not our function to screen lists of contributions, to pick out the good from the bad," but it further noted that it was "prepared to examine carefully claims for charitable contributions" and would disallow such claims "if the amounts are excessive in total or if the donees as a group are not relevant to the civic responsibilities of the public utility" (New York Tel. Co., 10 NY PSC, at p 379, 84 PUR3d, at p 349). In accordance with this policy, the PSC, in June of 1984, approved a request by the New York Telephone Company to include in its rates to consumers part of the cost of its contributions to several thousand charitable organizations. Petitioner thereafter commenced the present CPLR article 78 proceeding, arguing that the PSC's actions in approving the pass-along violated both the establishment and freedom of expression clauses in the First Amendment of the Federal Constitution.[1] Petitioner's constitutional claim is based largely on the Supreme Court's decision in Abood v Detroit Bd. of Educ. (431 US 209), in which the court held that forced indirect contributions to political groups in the form of mandatory agency-shop dues violates an employee's right to freedom of expression. In Abood, however, the dues payments were mandated by a collective bargaining agreement between the union and a governmental employer and were enforced by that employer's coercive power to discharge those who did not wish to participate. Thus, there was no doubt in Abood that the constitutional violation complained of was the product of State action.
Here, in contrast, the question of the State's involvement is very much in dispute. Although petitioner insists that his *276 quarrel is solely with the policy decision of the PSC, a governmental entity, it is apparent that the real source of his aggrievement is the action of the private utility, which, through the inherently coercive power of its status as a monopoly provider, is forcing him to make indirect contributions to charities he finds objectionable.[2] Consequently, although the majority concludes otherwise, Abood is manifestly not controlling here. What is more in point is the body of case law that addresses the problem of when the actions of a private entity may fairly be said to constitute "State action."
It is beyond question that the First and Fourteenth Amendments, upon which petitioner's claim depends, provide "no shield against merely private conduct, however * * * wrongful" (Shelley v Kraemer, 334 US 1, 13; see, Hudgens v NLRB, 424 US 507; SHAD Alliance v Smith Haven Mall, 66 N.Y.2d 396). Rather, those amendments protect only against those infringements of liberty that may in some sense be said to emanate from the actions of the State (see, Jackson v Metropolitan Edison Co., 419 US 345). It has been candidly acknowledged that "the question whether particular conduct is `private,' on the one hand, or `state action,' on the other, frequently admits of no easy answer" (Jackson v Metropolitan Edison Co., supra, at pp 349-350). Nonetheless, there are a number of previously applied standards that provide us with some guidance.
First, the fact that the private concern is heavily regulated by government is not alone sufficient to render the conduct of that private entity "State action" (Jackson v Metropolitan Edison Co., supra, at pp 350-353; see, Blum v Yaretsky, 457 US 991). While the actions of private concerns having these characteristics may "more readily be found to be `state' acts" than will the actions of others, there must still be a "sufficiently close nexus between the State and the challenged action * * * so that the action * * * may be fairly treated as that of the State itself" (Jackson v Metropolitan Edison Co., supra, at p 351). Significantly, this "nexus" cannot be established by simply showing that the private entity provides an essential public service or has a monopoly on the market, *277 where the service in question is not one that the State would traditionally provide (id., at pp 351-353).
A sufficient nexus may be demonstrated where the private action in question was compelled or directed by the State (see, Blum v Yaretsky, supra, at pp 1004-1005; Jackson v Metropolitan Edison Co., supra, at p 457). Alternatively, "State action" may be found to exist where the State "has exercised coercive power or has provided significant encouragement" so that the private choice may be deemed to be effectively that of the State (Blum v Yaretsky, supra, at p 1004; see, Flagg Bros. v Brooks, 436 US 149, 166). What is made absolutely clear by the case law, however, is that the State's mere acquiescence in the conduct of a regulated private entity does not transform an essentially private choice into a governmental action (Blum v Yaretsky, supra, at pp 1004-1005; Jackson v Metropolitan Edison Co., supra, at p 357; see, Montalvo v Consolidated Edison Co., 92 AD2d 389, affd on opn below 61 N.Y.2d 810).
In this case, petitioner argues that the charitable contribution pass-along has the earmarks of State action because the combination of the State's intensive involvement in rate-setting and the utilities' status as franchised monopoly providers results in his having to make forced contributions under the State's sponsorship. In this respect, however, petitioner's argument is no different in substance from that made by the dissenters and explicitly rejected by the majority in Jackson v Metropolitan Edison Co. (supra, at pp 351-352, 360-364 [Douglas, J., dissenting], at pp 366-373 [Marshall, J., dissenting]). Indeed, the majority's conclusion that "the combined effect of the utility's monopoly status and the rate order is no less coercive than the threat of employment loss in Abood" is virtually indistinguishable from Justice Douglas' argument that State action should be found to exist because "in the aggregate" such factors as Metropolitan Edison's State-authorized monopoly, its unilateral control over an essential public service and the "framework of extensive state supervision and control" warranted that conclusion (id., at pp 361-362 [Douglas, J., dissenting]). While it is true that, as a practical matter, the utilities' monopolistic status gives them a power to coerce that is equal in some respects to the coercive power of government, that circumstance alone does not transform what has traditionally been a private activity into a governmental one. Accordingly, although the coercion present in Abood is analogous to the coercion present here, the fact remains that in this *278 case, unlike in Abood, the coercion is an unfortunate by-product of private, not State, action.
Further, the fact that the PSC plays a vital role in the rate-setting process does not render the billing practices of the utilities the equivalent of "State action." The PSC was created by the Legislature to oversee utilities precisely because their monopoly status would otherwise enable them to engage unfettered in rate-setting and other practices inimical to the public welfare. Having undertaken to regulate utilities, however, the State did not thereby become the initiator of the utilities' actions.
It is true that providers of gas, electric and telephone services are not permitted to charge more than the PSC permits (see, Public Service Law § 65 [1]; § 91 [1]), and once the permissible rates are established, the utilities are not free to charge their customers less (Public Service Law § 66 [12]; § 92 [2]). However, the process by which those rates are established amply demonstrates that it is the utility, and not the PSC, which is the initiator of the disputed pass-along decision. As described in the PSC's brief, the process consists, in simplified form, of the utility's submitting a schedule of "revenue requirements" calculated on the basis of anticipated operating expenses. The PSC reviews these schedules and determines which items of projected expenses should be disallowed. The remaining "revenue requirements" then become the basis of the rates the utilities' customers pay. Manifestly, these are charges in which the PSC has, in the truest sense of the word, merely "acquiesced" by failing to disallow them.
When examined closely, petitioner's claim amounts to nothing more than a contention that the State has refused to interfere with the utilities' decisions to pass along their charitable contribution costs to their customers, the ratepayers. There is no allegation that the PSC has compelled this activity, and, indeed, there could be none. Nor can there be any colorable claim that the activity by which petitioner feels himself aggrieved is, overtly or covertly, coerced by the State, since it is virtually inconceivable that the coercive powers of the government would be necessary to induce private concerns such as the utilities involved in this case to pass along their costs rather than absorbing those costs themselves.
Indeed, the key to analysis in a case such as this is to subtract the government from the equation and then consider what the behavior of the private entity would be without any *279 governmental intervention at all. As the Supreme Court has stated, "[t]he nature of governmental regulation of private utilities is such that a utility may frequently be required by the state regulatory scheme to obtain approval for practices a business regulated in less detail would be free to institute without any approval" (Jackson v Metropolitan Edison Co., supra, at p 357). Here, if the regulatory powers of the State were not involved in the rate-setting process, utility companies, like most unregulated business concerns, would simply include in the price for their services the cost of whatever charitable donations they might choose to make.[3] By allowing these utilities to engage, to a limited extent, in a business practice that they would naturally have pursued if there had been no State involvement at all, the PSC has done no more than merely refuse to interfere with what is essentially a private decision.[4]
To be sure, one of the motivating factors behind the PSC's change in policy may well have been a desire to spur utilities to make charitable donations and thereby contribute to the public welfare (see, New York Tel. Co., 10 NY PSC, at pp 378-379, 84 PUR3d, at pp 349-350, supra). This underlying intention, however, does not constitute the type of "significant encouragement" that will convert the private decision at issue here into a governmental one (cf. Blum v Yaretsky, supra, at pp 1008-1009, n 19). Indeed, while the PSC may have intended to encourage private contribution, an activity which is itself unobjectionable, it has done nothing affirmatively to encourage the utilities to pass along the attendant costs to their *280 customers. Again, that is a decision which the PSC has merely approved or, more specifically, failed to interdict.
We note in closing that there is no allegation, in either the pleadings or the papers submitted on the dismissal motion, that the PSC has actually engaged in a qualitative review of the donees the utilities select as the objects of their generosity.[5] In contrast, the PSC has asserted that it has never required utilities to make charitable contributions or to select particular organizations for the contributions they choose to make. Further, the PSC has alleged that it has never interfered with a utility's choice of donees, although in 1970 it indicated that it might do so. Had it done so, our disagreement with the majority might not have been as acute.
In sum, it is evident that the PSC is not the source of petitioner's grievance and, consequently, we cannot agree that his rights under the First and Fourteenth Amendments have been violated. While the PSC has the power to, and in fact has in the past, forbid the practice to which petitioner objects, its refusal to exercise its authority in that manner now does not imbue the utilities' conduct with the characteristics of "State action." Thus, while reasonable minds may differ as to the wisdom of the PSC's policy of nonintervention in this area, it cannot be said that Federal constitutional rights are implicated. Inasmuch as we are bound by Supreme Court precedent in interpreting the Federal Constitution, we can reach no other conclusion than that the petitioner's proper remedy, if remedy there should be, rests with the Legislature, which has the authority to direct the PSC in the use of its regulatory powers (see, e.g., Public Service Law § 91 [2] [b]).
Accordingly, we would reverse the order of the Appellate Division and dismiss the petition in its entirety.
Order affirmed, etc.
NOTES
[1] Prior to 1970 the PSC refused to allow inclusion of charitable contributions as operating expenses on the grounds that they were "not necessary to the conduct of business and that they [were] made at the sole discretion of Company officers to donees of their choosing." (New York Tel. Co., case 25155 [July 1, 1970], at p 378.) The 1970 policy allows charitable contributions as "proper operating expenses" provided they are "not excessive in total" and that the donations are not irrelevant to the "civic responsibilities" of the utilities. Future allowances are to be measured from pre-1970 contribution levels.
[2] Central Hudson Gas and Electric Corporation, which supplies electricity to petitioner, was granted permission to intervene in this proceeding, and joined in the PSC's motion to dismiss the petition.
[3] We note that the current policy of the PSC in permitting utilities to include charitable contributions as costs conflicts with judicial decisions in other jurisdictions holding similar pass-through provisions unlawful as involuntary levies on ratepayers (see, e.g., Pacific Tel. & Tel. Co. v Public Utils. Commn., 62 Cal 2d 634, 401 P2d 353 [1965]; Chesapeake & Potomic Tel. Co. v Public Serv. Commn., 230 Md 395, 187 A2d 475 [1963]; Illinois Bell Tel. Co. v Illinois Commerce Commn., 55 Ill 2d 461, 303 NE2d 364 [1973]; State ex rel. Laclede Gas Co. v Public Serv. Commn., 600 SW2d 222, 229 [Mo 1980], appeal dismissed 449 US 1072 [1981]).
[4] Justice Stevens in Teachers v Hudson (475 US 292, ___, 106 S Ct 1066, 1075), stressing the point that "[t]he amount at stake for each individual dissenter does not diminish [his] concern", writes: "In Abood, we emphasized this point by quoting the comments of Thomas Jefferson and James Madison about the tyrannical character of forcing an individual to contribute even `three pence' for `the propagation of opinions which he disbelieves'".
[1] Petitioner has not asserted any claim that his rights under our State Constitution (NY Const, art I, § 8) have been violated (compare, SHAD Alliance v Smith Haven Mall, 66 N.Y.2d 496, with Sharrock v Dell Buick-Cadillac, 45 N.Y.2d 152).
[2] Contrary to the majority's view, that petitioner initially named the PSC and not the utility as the party defendant is of no consequence. In determining whether a claimed deprivation of a constitutional right involves an action by the State or merely a private decision, we look to the substance of the claim and not to the status of the party who has been sued (see, Blum v Yaretsky, 457 US 991, 1003).
[3] Contrary to the majority's assertion (majority opn, at p 271), we do not advance the PSC's noninvolvement in rate-setting as a "valid proposition" that requires "support in law or fact." Rather, we merely posit that noninvolvement hypothetically, as a means of demonstrating that, despite the majority's suggestion to the contrary (at p 273), the utilities' power to charge rates for their services is not derived from the PSC, but rather is a natural incident of their status as owners of those services.
[4] To the extent that private business concerns choose to make such donations out of their profits, it may be that they do so because of their belief that the market will not tolerate an increased price for their goods or services. Of course, utilities generally do not need to make such sensitive price calibrations, since their services are public necessities and the consumer simply cannot take his business elsewhere. Thus, to a large extent, utilities are free, in the absence of regulation, to pass along many types of business expenditures that other corporations would elect to absorb. This circumstance, however, is a by-product of utilities' status as monopolies, and not a result of any governmental intervention.
[5] Although Special Term indicated that petitioner had made such allegations, our own review of the papers does not bear out this conclusion. Indeed, in the briefs petitioner submitted in response to the dismissal motion, he acknowledged that the "recipients are selected solely at the discretion of the utility" and that "it is the express policy of the PSC not to regulate or screen the contributions or their recipients."