*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0213p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

PATRICIA M. MERRITT; FAYE HADLEY;
CARMEN PINCKNEY; MARY FILICE, and
similarly situated Northwest Airlines, Inc.
Quality Service Assistants,

                  *Plaintiffs-Appellants,*

     *v.*

INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE WORKERS; AIR
TRANSPORT DISTRICT 143 INTERNATIONAL
ASSOCIATION OF MACHINISTS AND
AEROSPACE WORKERS; ROBERT B. DEPACE,
in his capacity as President and Directing
General Chair of District 143, International
Association of Machinists and Aerospace
Workers; SANDRA K. WEBER, in her capacity
as General Chair and Lead Negotiator for
Clerical, Office, Fleet and Passenger Service
Employees of District 143, International
Association of Machinists and Aerospace
Workers,

                  *Defendants-Appellees.*

No. 09-1563

> Appeal from the United States District Court
> for the Eastern District of Michigan at Detroit.
> No. 06-14342—Stephen J. Murphy III, District Judge.
>
> Argued: January 14, 2010
>
> Decided and Filed: July 22, 2010

Before: BOGGS and GILMAN, Circuit Judges; McCALLA, Chief District Judge.[*]

_____

[*] The Honorable Jon P. McCalla, Chief United States District Judge for the Western District of Tennessee, sitting by designation.

1

---

**COUNSEL**

**ARGUED:** Dennis M. Devaney, DEVANEY, JACOB, WILSON PLLC, Troy, Michigan, for Appellants. Carmen R. Parcelli, GUERRIERI, CLAYMAN, BARTOS & PARCELLI, P.C., Washington, D.C., for Appellees. **ON BRIEF:** Dennis M. Devaney, DEVANEY, JACOB, WILSON PLLC, Troy, Michigan, for Appellants. Carmen R. Parcelli, Joseph Guerrieri, Jr., GUERRIERI, CLAYMAN, BARTOS & PARCELLI, P.C., Washington, D.C., for Appellees.

---

**OPINION**

---

JON P. McCALLA, Chief District Judge. Northwest Airlines ("Northwest") Quality Service Agents ("QSAs" or "Plaintiffs") sued the International Association of Machinists and Aerospace Workers; Air Transport District Lodge 143; Robert B. DePace, President and Directing General Chair of District 143; and Sandra K. Weber, General Chair and Lead Negotiator for Clerical, Office, Fleet and Passenger Service Employees of District 143 ("Defendants"). Plaintiffs allege that between 2000 and 2006 Defendants breached their duty of fair representation relating to the negotiation and administration of contracts on behalf of QSA employees ("Count I") and in handling QSA employees' dues-objector status requests ("Count II"). The district court granted summary judgment in favor of Defendants on Counts I and II and issued Rule 11 sanctions against Plaintiffs' counsel for failing to adequately investigate the law and facts before filing their complaint. For the reasons set forth below, we **AFFIRM** the district court's grant of summary judgment on Counts I and II and the grant of Rule 11 sanctions.

## I.  BACKGROUND

Plaintiffs are current and former Northwest QSAs.  Northwest created the QSA position in 1984 to perform a variety of passenger-service functions such as escorting unaccompanied minors through airports and acting as "meeters and greeters" at Northwest terminals.  Prior to 2000, QSAs were non-unionized, at-will employees. During this time, Northwest set pay levels for QSAs that varied based on employment location and specialized skills such as language abilities.  Raises were awarded on a merit-based system rather than a seniority-based pay scale.  QSAs also enjoyed various employment benefits, including F-3 travel pass privileges, which allowed them to travel ahead of most other non-management Northwest employees.

Defendants include the International Association of Machinists and Aerospace Workers ("IAM"); Air Transport District 143 ("District 143"); Robert B. DePace in his capacity as President and Directing General Chair of District Lodge 143; and Sandra K. Weber in her capacity as General Chair and Lead Negotiator for Clerical, Office, Fleet and Passenger Service Employees ("COFPS") of District 143.  The IAM is an international labor organization that represents, among many other individuals, Northwest QSAs.  District 143 is an intermediate level body within the IAM.  Under the Railway Labor Act ("RLA"), which governs labor relations in the airline industry, District 143 has exclusive collective bargaining responsibility for various crafts or classes of employees at Northwest, including QSAs.

In 1999, the IAM attempted to unionize the QSAs and led a campaign to collect authorization cards for a National Mediation Board ("NMB") election.  The NMB is the federal agency charged with determining representation disputes arising under the RLA. 45 U.S.C. § 152, Ninth.  On February 7, 2000, the IAM decided to seek accretion of the QSAs into the existing COFPS craft or class rather than proceed with an NMB-run election.  Northwest opposed this accretion proposal.  On April 4, 2000, the NMB issued a final decision that Northwest's QSAs should be accreted into the COFPS craft or class because QSAs and COFPS employees "share a community of interests" in that

their "duties are exclusively passenger service." The NMB noted that the COFPS craft or class was comprised of approximately 18,700 employees, compared to 361 QSAs. In an effort "to avoid fragmentation and instability," the NMB found that "an election [was] unwarranted."

Following the April 4, 2000, NMB decision, DePace, the President and Directing General Chair of District Lodge 143, requested that Northwest meet to negotiate an interim collective bargaining agreement ("CBA") for the newly accreted QSAs. The COFPS CBA in effect at the time did not expire until February 25, 2003. According to DePace, Northwest was not legally obligated to open this agreement prior to its expiration and was unwilling to do so because extending its benefits to QSAs would be costly. On July 8, 2000, various QSAs sent a letter to DePace, expressing their discontent with the outcome of the accretion decision. District 143 sent representatives to meet with QSAs and established a toll-free number for QSAs to contact the union with questions and concerns relating to the upcoming negotiations for an interim agreement. On August 11, 2000, DePace issued a bulletin informing QSAs that the interim agreement would not be voted upon, but was merely intended to cover the QSAs until the expiration of the COFPS CBA on February 25, 2003.

On October 24, 2000, District 143 and Northwest entered into a letter of agreement pertaining to the QSAs, commonly referred to as the "Accretion Agreement." Following the execution of the Accretion Agreement, QSAs were required to pay union dues even though they had not voted for a contract. Although District 143 was unable to incorporate QSAs into the existing COFPS CBA, the Accretion Agreement did secure several benefits. Most importantly, QSAs were able to maintain their F-3 manager-level passes until February 25, 2003. The agreement also established, among other things, a pay increase schedule, the accrual of vacation time, just-cause protection against discipline, a separate seniority district for QSAs, and seniority-based bidding on schedules. The Accretion Agreement, however, did not define QSA seniority in terms of pay rates – a factor that would become relevant during the 2006 bankruptcy negotiations.

Following the negotiation and execution of the Accretion Agreement in late 2000, QSAs allege that DePace and the IAM leadership became openly hostile to QSAs and their complaints. In particular, QSAs claim that DePace referred to them as "whiners" and wished he could "give them back [to Northwest]." QSAs also allege that complaints made to IAM leadership about the union's poor representation were ignored.

Shortly after the execution of the Accretion Agreement, the airline industry suffered a period of tremendous upheaval and substantial losses. From 2001 through 2004, major American air carriers lost $28 billion. Northwest, in particular, lost $3.8 billion between 2001 and the third quarter of 2005. During this period, the COFPS CBA expired and became open for negotiation on February 25, 2003. Sandra Weber was elected as the COFPS craft or class representative, and Thomas Roth, a labor economist, acted as the IAM financial consultant during the negotiations. Although a QSA employee failed to be elected as a COFPS negotiation representative, the IAM permitted two QSAs to serve as negotiation liaisons.

After nearly two years of negotiations, no agreement was reached. On August 18, 2005, the IAM and Northwest signed a tentative agreement that extended most of the COFPS CBA provisions to QSAs. The agreement, however, specified that QSA pay rates were still to be negotiated and seniority dates were still to be assigned. On September 14, 2005, less than one month after signing the tentative agreement, Northwest filed for Chapter 11 bankruptcy. Northwest proceeded to invoke Section 1113 of the Bankruptcy Code, permitting an employer to reject a CBA if rejection is found necessary for a successful reorganization. 11 U.S.C. § 1113(c). While Northwest's Section 1113 motion was pending, the bankruptcy court approved an emergency 19% pay cut for all IAM-represented employees. By September 25, 2005, Northwest made it clear to the IAM that its bankruptcy-restructuring goal was to cut labor costs by $873 million per year, including $190 million in labor savings from IAM-represented employees. Although Northwest proposed a 12.5% pay cut for most IAM-represented employees, including QSAs, it ultimately granted the IAM flexibility to determine how the labor savings should be achieved.

From January 9, 2006 to January 13, 2006, IAM and Northwest negotiators engaged in meetings in New York.  If the negotiators failed to reach an agreement, Northwest would be free to alter wages, work rules, and benefits at will.  The two QSA liaisons were permitted to attend the January meetings but were asked to leave the room when the elected negotiators discussed QSA salaries.  Northwest's chief negotiator, Julie Hagen Showers, stated after the negotiations that the fairest solution was to impose an 11.5% across-the-board pay cut for all IAM members.

Once the percentage pay cut was set, Patrick Clay, Northwest's finance representative, and Thomas Roth, the IAM's financial consultant, worked together to create pay scales to reflect the pay cut for each employee group.  Operating under the general directive that all employees were to take an 11.5% pay cut from current salaries, Roth and Clay encountered a challenge with the 307 QSAs[1] out of the 14,622 IAM-represented employees.  Unlike other COFPS employees, QSAs did not have an existing seniority-based pay scale.  As noted previously, QSA salaries prior to joining the IAM were merit-based and varied based on factors such as location and language skills.  If QSAs were transferred directly to a seniority-based pay scale, it was possible for a QSA with significant seniority, but a low salary, to receive a pay raise rather than an 11.5% pay cut.

As a result, Roth and Clay developed a new seniority-based pay scale for the QSAs.  Prior to the 2000 Accretion Agreement, QSAs were paid an hourly rate, starting at $7.25 per hour and topping out at $10.50 per hour subject to merit-based increases. According to the new seniority-based pay scale, a first-year QSA would earn $7.00 per hour, continuing up to $12.25 for a tenth-year QSA and thereafter.  To determine a QSA's position on the newly created scale, Roth and Clay first reduced the existing salary of every QSA by 11.5% – the same as all other COFPS employees.  They then took the resulting wages from all 307 QSAs after the 11.5% pay cut and assigned each one to the corresponding level on the new seniority-based pay scale.  A QSA's position

---

[1]The Court notes that at the time of the negotiations the number of QSAs had decreased from 361 in April 2000 to 307 in January 2006.

on the new seniority-based pay scale thus did not reflect his or her actual years of service, but rather his or her prior wage, which was a function of merit increases based on factors such as location and language abilities.

After each QSA had been assigned to a new pay level, Roth persuaded Northwest to place all QSAs at the next-highest pay scale level, despite the fact that this rounding method meant that on average QSAs experienced only an 8.9% pay cut.[2] The new seniority-based pay scale established a track for QSAs to progress based on service, like all other COFPS members, rather than on merit increases. The completed pay scales for all IAM members, including QSAs, were reviewed by lead negotiators Showers and DePace before they were submitted to the IAM membership for a ratification vote.

On January 19, 2006, the IAM posted Northwest's proposed Bankruptcy Agreement on the Internet and mailed it to union members. Many QSAs saw the QSA seniority-based pay scale and believed they would be placed on the scale according to their years of service even if it resulted in a pay increase. On February 1, 2006, David Driscoll, a labor relations officer at Northwest, issued an email clarifying the QSA pay scale. The email explained that all QSAs would be subject to the same 11.5% pay cut

---

[2]The methodology for creating and applying the QSA seniority-based pay scale was as follows:

**Step 1:** Roth and Clay created a seniority-based pay scale that would take effect on the date the negotiated agreement was signed (August 1, 2006).

| 1st Year | $7.00 per/hr | 6th Year | $9.75 |
|---|---|---|---|
| 2nd Year | $7.50 | 7th Year | $10.50 |
| 3rd Year | $8.00 | 8th Year | $11.00 |
| 4th Year | $8.75 | 9th Year | $11.50 |
| 5th Year | $9.25 | Thereafter | $12.25 |

**Step 2:** Roth and Clay then applied an 11.5% pay cut to each QSA's existing salary.

**Step 3:** Based on the result from step 2, the QSA was placed on the next-highest corresponding wage rate on the pay scale created in step 1.

**Example:** A QSA who had been employed for seven years, but was making only $8.00 per hour based on merit increases, would have his salary decreased by 11.5%. This would result in a new wage rate of $7.08 per hour, corresponding to a first-year QSA salary on the new seniority-based pay scale. This QSA would then be "bumped" up to the next highest seniority-based pay scale level. The QSA who had been employed for seven years would be making $7.50 per hour as a second-year wage employee. It is not the case that a QSA who had worked seven years, but was only paid $8.00 per hour, would make $10.50 per hour after the agreement took effect.

applicable to all IAM employees. It was not the case that "some QSAs would receive a pay raise in certain cases up to 33%."

On March 7, 2006, the IAM announced that the COFPS membership, including the QSAs, ratified the Bankruptcy Agreement by a vote of 67% to 33%. Those QSAs who opposed the ratified agreement signed three different petition-style letters – one from each of the major Northwest hubs: Detroit, Minneapolis, and Memphis – indicating that they wished to resign their union membership and become dues-objectors. The letters were drafted by counsel and posted in work areas for signatures. QSAs do not dispute the fact that the IAM has a written policy covering dues objections, which is published to represented employees. The policy provides that dues-objector requests must be in the form of a letter and include the objector's signature and address. Despite the assistance of legal counsel in preparing the letters, no addresses were included and in many cases the signatures were illegible.

During the course of litigation, Defendants filed a motion for Rule 11 sanctions, alleging that Plaintiffs' counsel failed to sufficiently research the underlying facts and existing law before filing the complaint. This alleged failure resulted in the naming of plaintiffs who were never employed by Northwest as QSAs, who were not QSAs during the relevant time periods, and who never made dues-objector requests or were not paying dues at the time their requests were made. The district court granted in part and denied in part Defendants' Rule 11 motion, concluding that Plaintiffs' counsel failed to take minimal investigatory steps prior to filing the complaint. The district court also granted summary judgment in favor of Defendants on Counts I and II, finding that Plaintiffs failed to produce evidence that raised a genuine issue of material fact that Defendants breached their duty of fair representation.

Plaintiffs now appeal, claiming that the district judge erred by applying the deferential "arbitrary" standard to their claims that Defendants' conduct was unlawfully discriminatory and thereby breached their duty of fair representation. Plaintiffs contend that this deferential standard does not apply to allegations of discrimination and, had the

district court applied the appropriate standard, it would have found the existence of genuine issues of material fact on Counts I and II. Plaintiffs also contest the grant of Rule 11 sanctions.

## II. ANALYSIS

### A.    Standard of Review

We review *de novo* a district court's grant of summary judgment. *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 393 (6th Cir. 2008). Summary judgment is proper where no genuine issue of material fact exists and the nonmoving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

A district court's award of Rule 11 sanctions is reviewed for abuse of discretion. *Rentz v. Dynasty Apparel Indus., Inc.*, 556 F.3d 389, 395 (6th Cir. 2009). "A district court abuses its discretion if it bases its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Brown v. Raymond Corp.*, 432 F.3d 640, 647 (6th Cir. 2005) (internal quotation marks omitted).

### B.    Duty of Fair Representation; Tripartite Standard

A union's duty of fair representation to its members is judicially implied under the Railway Labor Act. *See generally Steele v. Louisville & Nashville R.R. Co.*, 323 U.S. 192 (1944). This duty is also applicable to air carriers. 45 U.S.C. § 181. The duty of fair representation requires a union "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes*, 386 U.S. 171, 177 (1967) (citations omitted). This duty applies in all contexts of union activity, including contract

negotiation, administration, enforcement, and grievance processing. *Williams v. Molpus*, 171 F.3d 360, 364-65 (6th Cir. 1999) (citing *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 77 (1991)). A breach of the duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith. *Vaca*, 386 U.S. at 190.

Under this tripartite standard, a court should look to each element when determining whether a union violated its duty. *O'Neill*, 499 U.S. at 77. Therefore, the three separate levels of inquiry are as follows: "(1) did the union act arbitrarily; (2) did the union act discriminatorily; or (3) did the union act in bad faith." *Griffin v. Air Line Pilots Ass'n, Int'l*, 32 F.3d 1079, 1083 (7th Cir. 1994). In order to successfully defend against a motion for summary judgment on a duty of fair representation claim, the plaintiff must point the court to evidence in the record supporting at least one of these elements. Fed. R. Civ. P. 56(e).

A union's actions breach the duty of fair representation under the "arbitrary prong" if the union's conduct can fairly be characterized as "so far outside a wide range of reasonableness" that it is "wholly irrational." *See O'Neill*, 499 U.S. at 78 (internal citation omitted). A union acts in "bad faith" when "it acts with an improper intent, purpose, or motive . . . encompass[ing] fraud, dishonesty, and other intentionally misleading conduct." *Spellacy v. Airline Pilots Ass'n-Int'l*, 156 F.3d 120, 126 (2d Cir. 1998) (citing *Baxter v. United Paperworkers Int'l Union, Local 7370*, 140 F.3d 745, 747 (8th Cir. 1998)). Although it is difficult to provide a precise definition of "discriminatory" conduct that breaches the duty of fair representation, the Supreme Court in *Amalgamated Ass'n of Street, Electric Railway & Motor Coach Employees of America v. Lockridge*, 403 U.S. 274, 301 (1971), held that the duty "carries with it the need to adduce substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives." *See also Vaca*, 386 U.S. at 177 (noting that the duty of fair representation developed in a series of cases alleging racial discrimination that was "irrelevant or invidious" and served no legitimate union objectives).

Without more, merely alleging that a union's conduct favored one group over another does not constitute a breach of the duty of fair representation. The power of the union to exercise its discretion and to draw reasonable distinctions among groups of employees during the bargaining process was originally emphasized in *Ford Motor Co. v. Huffman*, 345 U.S. 330 (1953). In *Huffman*, the Supreme Court upheld a union's discretion to award generous seniority credit to military veterans. *Id.* at 342-43. The Court in *Huffman* emphasized that a union's authority to negotiate "derives its principal strength from a delegation to the negotiators of a discretion to make such concessions and accept such advantages as, in the light of all relevant considerations, they believe will best serve the interests of the parties represented." *Id.* at 337-38. The Court continued:

> Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.

*Id.* at 338.

Following *Huffman*, the Supreme Court in *O'Neill*, in reversing the Fifth Circuit, emphasized that "any substantive examination of a union's performance . . . must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities." *O'Neill*, 499 U.S. at 78. The Court noted that Congress did not "intend judicial review of a union's performance to permit the court to substitute its own view of the proper bargain for that reached by the union." *Id.* The Court also observed that "the approach of the Court of Appeals [wa]s particularly flawed because it fail[ed] to take into account either the strong policy favoring the peaceful settlement of labor disputes, . . . or the importance of evaluating the rationality of a union's decision in light of both the facts and the legal climate that confronted the negotiators at the time the decision was made." *Id.* at 78. In *O'Neill*, the

union negotiators reached an agreement in the context of a bitter strike, and the Supreme Court determined that the settlement should be given a high level of deference.  *See id.* at 81.

Similarly, the Sixth Circuit has granted deference to a union's collective bargaining decisions under the "arbitrary prong" of the tripartite analysis, but not the "bad faith" or "discriminatory prongs."  *See Ratkosky v. United Transp. Union*, 843 F.2d 869, 876 (6th Cir. 1988) (noting that "unions are given broad discretion by the courts in their collective bargaining decisions" because there are often a "variety of legitimate options," and the courts should be careful not to "substitute their judgments for those of the authorized labor organizations").  *Ratkosky*, which concerned a labor dispute involving the negotiation and establishment of a two-tiered seniority system, noted that the mere fact that "a seniority system in a collective bargaining agreement favors one group more than another does not in itself constitute a breach of the union's duty [of fair representation]."  *Id.*  Bad faith or intentional discrimination must be shown.  *Id.*  In particular, evidence of a bad faith motive or a hostile intent to discriminate against a portion of the union's membership is an essential element necessary to impose a limitation on a union's discretion in bargaining.  *See id.* at 877 (quoting *Hardcastle v. W. Greyhound Lines*, 303 F.2d 182, 185 (9th Cir. 1962)).

These cases demonstrate that a substantive examination of a union's performance must be deferential under the "arbitrary" analysis prong, recognizing the wide latitude that negotiators require for the effective performance of their bargaining responsibilities. This deferential review, however, is no longer appropriate once allegations of bad faith or discriminatory conduct are made because such actions, if proven, would not be taken in the interest of all of the union's members with good faith and honesty, nor can they be related to a union's legitimate objectives.  *See Ratkosky*, 843 F.2d at 876-77.

C.    **Genuine Issues of Material Fact**

Even without deferential review of the IAM's conduct, QSAs have failed to assert sufficient allegations of discriminatory conduct under Counts I and II, rising to the level of being "intentional, severe, and unrelated to legitimate union objectives." *Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Employees of Am.,* 403 U.S. at 301. Whether a bargaining representative has acted fairly, impartially, and without hostile discrimination depends on the facts of each case. *Balowski v. Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am.*, 372 F.2d 829, 834 (6th Cir. 1967). The QSAs' primary allegation of discriminatory conduct is that the IAM created a seniority-based pay scale that failed to take into account a QSA's actual years of service, making it unlike the scale applicable to all other COFPS members. According to the QSAs, this action reflects the IAM's hostile and discriminatory conduct towards them. The undisputed facts, however, establish a legitimate reason for the distinction. Without evidence of intentional and severe discrimination unrelated to legitimate IAM objectives, this difference in treatment is an inevitable and fact-based part of the negotiation process.

In *Ratkosky*, the court found that a union had not breached its duty of fair representation when it negotiated a bargaining agreement with a railroad for establishing seniority rights that negatively impacted a small group of union-represented railroad workers. *See Ratkosky*, 843 F.2d at 878-79. The court found that nothing in the record showed that the union's negotiation of the two-tiered system or its subsequent refusal to renegotiate the system was done in bad faith or with a hostile intent toward plaintiffs. *Id.* "The mere fact that plaintiffs [were] a minority group within their union organization and that they were adversely affected by the actions of the union [did] not establish that the union acted with hostile or discriminatory intent." *Id.*

In contrast, in *Williams v. Molpus*, this court found that the plaintiffs had presented evidence from which a jury could find that the union acted in bad faith or with discriminatory intent. 171 F.3d at 367. *Molpus* involved the negotiation of a rider to a

collective bargaining agreement between a parent company and its two subsidiaries. The plaintiffs put forth evidence that: (1) seniority status was rarely endtailed[3] and the union offered contradictory reasons to support the legitimacy of endtailing; (2) the endtailing was proposed by the union itself, not demanded by the parent company; (3) the ratification of the agreement was likely based upon a misrepresentation by the union as to who had approved the agreement; (4) the union made a material misrepresentation to the plaintiffs about the party that demanded the endtail provision; (5) the agreement favored nine employees to the detriment of 200; and (6) one of the nine employees benefitted by the agreement was the union representative's son. *Id.* at 367. In the instant case, although certain QSAs may have been negatively impacted by the interpretation and implementation of the seniority-based pay scale in the August 1, 2006 Bankruptcy Agreement, the record lacks facts similar to *Molpus* from which a jury could reasonably find evidence of discriminatory intent.

### 1.      *October 24, 2000 Accretion Agreement*

With regard to the October 24, 2000 Accretion Agreement, the QSAs contend that the IAM acted discriminatorily by executing the Accretion Agreement with Northwest without a QSA vote. It is undisputed that the IAM originally prepared an application for an NMB-run election. On February 7, 2000, rather than continuing the application process, the IAM requested that the QSAs be accreted into the existing COFPS craft or class. Northwest submitted arguments to the NMB contesting this accretion. Although the exact reason for the change in unionization strategy is unknown, the QSAs presented no evidence that the decision was motivated by bad faith or a discriminatory intent. Moreover, the final decision to accrete the QSAs into the COFPS craft or class, which negated the need for an election, was made by the NMB, a federal agency beyond the control of the IAM.

---

[3]Endtailing is the process whereby transferring employees are placed at the bottom of a terminal seniority list. In contrast, dovetailing is the process whereby two or more merged seniority lists recognize the original terminal seniority dates of each employee. *Williams*, 171 F.3d at 363.

The QSAs direct the court only to minimal, inconclusive, and isolated evidence of IAM hostility, none of which rises to the level of discriminatory conduct that is intentional, severe, and unrelated to legitimate union objectives. Arden Cody, an IAM negotiator, stated in her deposition that DePace referred to QSAs as a bunch of "whiners," said they were "a lot of trouble," and that he would "like to give them back" to Northwest. From Cody's deposition it appears that these were isolated comments, made after the execution of the Accretion Agreement, and made over the course of a six-year period. Even taking these statements as true, they still fail to support allegations of intentional and severe discriminatory conduct sufficient to support a claim for breach of duty of fair representation.

Moreover, DePace testified in his deposition, and the QSAs offered no facts to contradict his testimony, that Northwest did not want, nor was it legally obligated, to open the COFPS CBA prior to its expiration because doing so would be costly. During the Accretion Agreement negotiations from Spring 2000 to Fall 2000, the union established a toll-free number to address QSA concerns and met with various QSAs to discuss their concerns. In the Accretion Agreement, the IAM was able to preserve the QSAs' F-3 passes until February 25, 2003, even though Northwest had threatened to revoke the passes in prior years. Additionally, the agreement established a pay-increase schedule, the accrual of vacation time, just-cause protection against discipline, and a separate seniority district for QSAs and seniority-based bidding on schedules.

The QSAs nevertheless contend that the IAM acted discriminatorily by failing to define seniority or a seniority-based pay scale for the QSAs in the Accretion Agreement like other members of the COFPS craft or class. It is undisputed, however, that at the time the Accretion Agreement was executed in 2000, QSA salaries were based on merit increases rather than seniority. The omission of a seniority definition or seniority-based pay scale therefore was not discriminatory because it was consistent with QSAs' prior employment history. The Accretion Agreement was only an interim agreement to maintain and potentially improve QSA benefits until the COFPS CBA opened for renegotiation in 2003. There would have been no way for the IAM to

anticipate that failing to define seniority or create a seniority-based pay scale in 2000 would cause a dispute in future CBA negotiations that would be complicated by industry-wide turmoil and Northwest's bankruptcy.

### 2.     *August 1, 2006 Bankruptcy Agreement*

With regard to the negotiation and administration of the August 1, 2006 Bankruptcy Agreement, the QSAs advance three facts as supporting their discrimination claim: (1) no QSA representative was included in QSA salary negotiations; (2) QSA complaints were ignored; and (3) the creation and interpretation of the QSA seniority-based pay scale was inconsistent with the historical method of applying pay scales, making QSAs the only unit of IAM employees whose years of service did not count toward their pay rates in the agreement. Each argument is addressed in turn.

It is undisputed that a QSA was not elected to be a lead negotiator for the COFPS craft or class when the COFPS CBA expired in 2003 despite promises in 2000 that such action would occur. Although a QSA failed to be elected by the entire COFPS membership, the IAM permitted QSAs to elect two representatives to serve as negotiation liaisons. QSAs contend that the union "booted" the liaisons out of specific negotiation sessions during the January 2006 meetings relating to QSA pay. In response, Defendants assert that (1) only elected COFPS representatives were permitted to be present during private negotiation sessions and (2) the QSA liaisons were not the only special interest group prohibited from attending these closed-door sessions. The record contains no facts indicating that the non-elected QSA liaisons were treated differently than all other non-elected representatives. Therefore, Plaintiffs' claim of discrimination based on the exclusion of QSA representatives from QSA salary negotiations must fail.

The QSAs next assert that the IAM ignored QSA complaints regarding the union's representation. The record, however, does not include attachments of these complaints or any other means for determining if the complaints were meritorious and ignored in bad faith or processed differently from other union member complaints. Thus the Plaintiffs' second assertion fails for lack of support in the record before the court.

The QSAs' third and primary allegation of discriminatory conduct is that the creation and interpretation of the 2006 Bankruptcy Agreement pay scale was inconsistent with the historical method of applying pay scales, leaving QSAs as the only unit of IAM employees whose years of service did not count toward their pay rates. The QSAs claim that this is direct evidence that Defendants acted with a discriminatory intent. The deposition testimony from Roth, DePace, and Showers, however, supports a legitimate rationale for the differing treatment. Northwest made it clear it had to receive $190 million in labor savings or it would seek to void existing CBAs in its Chapter 11 bankruptcy proceedings. The QSAs argue that it is significant that the IAM, not Northwest, proposed the QSA pay scale, but this factor must be evaluated in the context of the entire negotiations. The fact that the IAM had a degree of flexibility in achieving Northwest's cost-saving goals and did not award QSAs pay raises during bankruptcy negotiations  does not establish evidence of discriminatory conduct. Moreover, it is undisputed that nearly every other COFPS member received a pay cut as a result of the bankruptcy negotiations.

The creation of and conversion to a seniority-based pay scale reflected the need to implement an across-the-board 11.5% pay cut while compensating for the varied salaries caused by the QSAs' merit-based pay system. Had the IAM created a seniority-based pay scale and assigned each QSA a salary based on that QSA's actual years of service, it risked giving pay raises to a handful of IAM employees, while the remaining 14,000-plus IAM employees incurred pay cuts. Such a result could have lent itself to a discriminatory inference. Additionally, not all QSAs were negatively impacted by the new seniority-based pay scale. QSAs working for fewer years, but receiving higher pay rates due to merit-based raises, would have received a disproportionate pay reduction if the new seniority-based pay scale was based solely on actual years of service. Moreover, DePace, the individual singled out as being most hostile toward QSAs, was not responsible for the creation or interpretation of the disputed pay scales. Although DePace reviewed the final pay scales, the creation of the scales was assigned to Thomas Roth, the IAM financial representative, and Patrick Clay, Northwest's financial

representative. There is no evidence that DePace exerted any improper influence or pressure over Roth and Clay while implementing the QSA seniority-based pay scale.

Finally, any possible misinterpretation of the proposed QSA seniority-based pay scale was corrected by David Driscoll's February 1, 2006 email stating that all QSAs would be subject to an 11.5% pay cut. The email emphasized that "it is NOT the case (as apparently many QSAs believe) that an 8-year QSA who is currently making $8.00/hr will go, on date of signing, to the 8th year pay step ($11.00) and, in effect receive a 35% raise . . . . No employee group is coming out of this with a pay raise." On March 7, 2006, QSAs had an opportunity to vote on the proposed agreement along with the rest of the COFPS members, and it was ratified by a vote of 67% to 33%. As noted in *Ratkosky*, the mere fact that Plaintiffs were a minority group within their union organization and were adversely affected by the actions of the union does not establish that the union acted with hostile or discriminatory intent. *Ratkosky*, 843 F.2d at 878-79.

Based on these reasons, we **AFFIRM** the district court's grant of summary judgment in favor of Defendants on Count I of Plaintiff's duty of fair representation claim regarding the negotiation and administration of the October 24, 2000 Accretion Agreement and the 2006 Bankruptcy Agreement.

## D.     Dues-Objector Status Requests

The QSAs next contest the district court's grant of summary judgment in favor of Defendants on Count II regarding the processing of QSA dues-objector status requests in 2006. The QSAs argue that the IAM was on notice for many years that it is unlawful for unions to place arbitrary limitations on members seeking dues-objector status. Without identifying specific union action, the QSAs allege that the IAM made them "jump through unlawful . . . procedural hoops" to make their March 2006 dues-objector requests.

Non-union employees may be required, as a condition of their employment, "to pay a fair share of the union's cost of negotiating and administering a collective

bargaining agreement." *Chicago Teachers Union, Local No. 1 v. Hudson*, 475 U.S. 292, 301 (1986). At the same time, "non-union employees do have a constitutional right to prevent the union [from] spending a part of their required service fee to contribute to political [activities] unrelated to its duties as an exclusive bargaining representative." *Id*. at 301-02. In *Hudson*, the Supreme Court established three requirements for the procedures unions put in place to handle objections to fee allocations, with the intent to minimize the risk that objectors' First Amendment rights will be burdened. First, the procedures must "minimize the risk that non-union employees' contributions might be used for impermissible purposes." *Id.* at 309. Second, the union must provide adequate "information about the basis for the proportionate share" of the union expenses objectors must pay. *Id.* at 306. Third, a union procedure must "provide for a reasonably prompt decision by an impartial decisionmaker" adjudicating fees that are in dispute. *Id.* at 307. The objecting member, however, bears the initial burden of making the objection known to the union. *See Bhd. of Ry. & S.S. Clerks, Freight Handlers, Express & Station Employees v. Allen*, 373 U.S. 113, 118-19 (1963).

In *Tierney v. City of Toledo*, 824 F.2d 1497 (6th Cir. 1987), the court noted that "[p]rocedures . . . must afford dissenting non-members a reasonable time to voice their objections and must not be framed so as to discourage the exercise of their First Amendment rights by intimidation or the imposition of unrealistic and excessively complex procedural requirements." *Id.* at 1503. *Tierney* upheld a union rule requiring non-members to renew their objections on an annual basis. *Id.* at 1506. The court reasoned that since the burden of making an objection is placed upon the objecting employee, it is not "unreasonable" to require the employee to object each year "so long as the union continues to disclose what it must before objections are required to be made." *Id.*

In the instant case, QSAs have failed to submit any evidence that the IAM improperly handled the March 2006 dues-objector status requests. These requests were in the form of three petition-style letters, one from each of Northwest's major hubs in Detroit, Minneapolis, and Memphis. The IAM's published dues-objector status

procedure requires that an objector provide a current address, enabling the IAM to send follow-up correspondence regarding the status of the dues-objector request and the calculation of the reduced fee as required by law. This does not impose an unrealistic and excessively complex procedural requirement under *Tierney*'s standard.

The QSAs do not claim that they lacked notice of this procedure. Despite being aware of this requirement and having the assistance of counsel while preparing the March 2006 letters, QSAs simply failed to include the requested information. The fact that the IAM did not process these procedurally deficient requests does not constitute evidence of discrimination. There is no evidence that the IAM processed any other deficient requests, nor is there evidence from which the court could infer that the IAM would have rejected properly asserted QSA dues-objector status requests. To the contrary, evidence in the record demonstrates that when QSA dues-objector status requests included a return address, they were processed within several days and returned to the objector with the necessary information.

For these reasons, we **AFFIRM** the district court's grant of summary judgment in favor of Defendants on Count II.

### E.       Rule 11 Sanctions

Under Federal Rule of Civil Procedure 11, sanctions may be imposed if "a reasonable inquiry discloses the pleading, motion, or paper is (1) not well grounded in fact, (2) not warranted by existing law or a good faith argument for the extension, modification or reversal of existing law, or (3) interposed for any improper purpose such as harassment or delay." *Herron v. Jupiter Transp. Co.*, 858 F.2d 332, 335 (6th Cir. 1988). The purpose of sanctions is to deter the abuse of the legal process. *Id.* Rule 11 was amended in 1983 to facilitate the imposition of sanctions against attorneys who disregard their professional responsibilities to the court. *Id.* As amended, the rule "stresses the need for some pre-filing inquiry into both the facts and the law to satisfy the affirmative duty imposed." *Id.* (citing Fed. R. Civ. P. 11 advisory committee's note

to the 1983 amendment); *see also Century Prods., Inc. v. Sutter*, 837 F.2d 247, 250 (6th Cir. 1988).

The conduct of counsel who are the subject of a sanction request is measured by an objective standard of reasonableness under the circumstances. *INVST Fin. Group, Inc. v. Chem-Nuclear Sys., Inc.*, 815 F.2d 391, 401 (6th Cir. 1987). The court is "expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted." *Id.* (citation and quotation marks omitted). "[T]he reasonable inquiry under Rule 11 is not a one-time obligation." *Runfola & Assocs., Inc. v. Spectrum Reporting II, Inc.*, 88 F.3d 368, 374 (6th Cir. 1996) (quoting *Herron*, 858 F.2d at 335). "[T]he plaintiff is impressed with a continuing responsibility to review and reevaluate his pleadings and where appropriate modify them to conform to Rule 11." *Id.* (quoting *Herron*, 858 F.2d at 335-36).

The district court's award of Rule 11 sanctions is reviewed for abuse of discretion. *Rentz v. Dynasty Apparel Indus., Inc.*, 556 F.3d 389, 395 (6th Cir. 2009). "A district court abuses its discretion if it bases its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Brown v. Raymond Corp.*, 432 F.3d 640, 647 (6th Cir. 2005) (internal quotation marks omitted). Based on the facts in the record, we cannot conclude that the district court's ruling was based on an erroneous view of the law or a clearly erroneous assessment of the evidence.

In this case, the district court found that Plaintiffs' counsel failed to make a reasonable inquiry concerning the allegations in the complaint. This failure caused the Defendants to incur expenditures in identifying named plaintiffs who did not have any colorable claims. The district court found that Plaintiffs' counsel improperly pursued claims by: (1) eight individuals who had never been employed by Northwest; (2) several individuals who were not QSAs during the relevant time periods asserted in the complaint; and (3) several individuals who never requested dues-objector status or were already not paying dues at the time their dues-objector status requests were made.

In particular, the district court noted that the facts demonstrated that Plaintiffs' counsel had simply taken names from a list given to them by a "Litigation Steering Committee" organized by the QSAs to keep records of individuals who had given money to join the action. By doing so, Plaintiffs' counsel asserted claims for 179 plaintiffs, several of whom were revealed after discovery to have no claim for relief, but nevertheless had claims pending almost two years later. Ultimately, the district court concluded that the mere fact that counsel may have been willing to amend the complaint, if required, did not change the fact that counsel filed the complaint without adequate investigation. The district court awarded reasonable attorney's fees incurred in uncovering those Plaintiffs and claims that had no basis in fact. On April 21, 2009, Defendants filed a motion seeking attorneys' fees and expenses in the amount of $69,447.21. Plaintiffs' counsel responded to this motion on May 12, 2009. As of the present date, the motion is still pending in the district court.

On appeal, Plaintiffs' counsel contends that the district court relied on an erroneous view of the law and a clearly erroneous assessment of the evidence. Plaintiffs' counsel contends (1) that the inclusion of eight individuals never employed by Northwest was the result of a clerical error, which upon discovery it offered to correct; (2) the complaint properly complied with Federal Rule of Civil Procedure 8(a)(2), requiring only "a short and plain statement of the claim showing that the pleader is entitled to relief"; and (3) that at the time the complaint was filed on October 2, 2006, it was reasonable to rely on the signatures contained in the three dues-objector status petitions.

Recognizing that the duty under Rule 11 imposes a "continual obligation on attorneys to refrain from pursing meritless or frivolous claims at any stage of the proceedings," *see Herron*, 858 F.2d at 336, it is important to review the grant of sanctions in the context of the litigation history of this action. Plaintiffs filed their complaint on October 2, 2006, naming 179 QSAs and alleging a breach of the duty of fair representation for failing to represent QSAs adequately in regard to the 2000 Accretion Agreement, the 2006 Bankruptcy Agreement, and the handling of March 2006

dues-objector status requests. In May 2007, Defendants served written discovery requests on Plaintiffs and ultimately consented to a sixty-day extension of time for Plaintiffs to respond. The court later granted Plaintiffs an additional ninety-day extension. When the responses were returned, they appeared to be completed without the assistance of counsel, all the answers were handwritten, some provided in red marker or pencil, and rarely in full sentences. When some named plaintiffs failed to respond in whole or in part to written discovery requests and failed to appear for depositions, Defendants filed a motion to compel on November 29, 2007. The motion was granted in part on January 16, 2008, and held in abeyance pending further proceedings on Defendants' request for costs and fees associated with the motion. On January 31, 2008, Plaintiffs' counsel noted in a letter that several Plaintiffs were erroneously named in the suit.

First, Plaintiffs' counsel argues that the district court abused its discretion by refusing to consider the naming of eight individuals not employed by Northwest as a clerical error that Plaintiffs' counsel was willing to correct. The eight individuals improperly named were ultimately found to be spouses of QSA employees. It was determined through discovery that the names of the spouses were included because they submitted checks to the Litigation Steering Committee on behalf of their QSA spouses. When Plaintiffs' counsel copied the names from the list submitted by the Litigation Steering Committee without further investigation, it improperly included the names of the spouses. Although Plaintiffs' counsel stipulated to the substitution of the names, this came more than a year after filing the complaint and after significant discovery. The basis for the district court's sanction grant was not that a clerical error was made, but that had Plaintiffs' counsel adequately researched the factual basis for the claims rather than copying the Litigation Steering Committee list, no "clerical error" would have occurred. *See Kuzmins v. Employee Transfer Corp.*, 587 F. Supp. 536, 538 (N.D. Ohio 1984) (finding that a clerical error that would have been discovered through minimal inquiry into the law before signing the complaint was a proper ground for Rule 11 sanctions).

Next, Plaintiffs' counsel contends that the district court abused its discretion by finding that the "effect of the complaint as alleged is to aver that Defendants violated the duty of fair representation with respect to all Plaintiffs in connection with both the Accretion Agreement and the Bankruptcy Agreement, and fail[ure] to provide dues-objector status to all Plaintiffs." Ultimately, Plaintiffs' discovery responses established that "such averments are demonstrably false with respect to a number of Plaintiffs" who were not employed as QSAs as of the date of filing and other times relevant to the complaint. The district court found that such information could have been obtained in a proper pre-filing investigation. Plaintiffs' counsel contends that this reading of the complaint is clearly erroneous because it was never alleged that every individual QSA was harmed by all acts of misconduct by Defendants spanning the six-year period. According to Plaintiffs' counsel, Rule 8's general pleading standard permits counsel to list all Plaintiffs without specifying the claims applicable to each.

Upon review of the allegations in the complaint, we cannot conclude that the district court's reading of the complaint is clearly erroneous. The facts of the complaint as alleged support a reading that all 179 plaintiffs suffered harm from Defendants' actions spanning the entire course of the six-year period. Paragraphs 10 through 14 describe the QSAs' situation prior to the execution of the Accretion Agreement on October 24, 2000. Paragraphs 15 through 29 then proceed to describe the course of events from 2000 to 2006, asserting the harm suffered by QSAs from the IAM's alleged breach of the duty of fair representation. Paragraph 30, where the claim for the breach of the duty of fair representation is asserted for the harms incurred from the 2000 Accretion Agreement and the 2006 Bankruptcy Agreement, specifically states that:

> Plaintiffs repeat, reiterate, and reallege *each and every* allegation contained in paragraphs 1 through 29 as if more fully set forth herein. As the exclusive collective bargaining representative of Plaintiffs, Defendant IAM and District 143, DePace, and Weber owed, and continue to owe, Plaintiffs, and *each* of them, a duty of fair representation . . . . For various reasons stated above, and by virtue of the above described acts and omissions, Defendants have violated and breached their duty of fair representation to Plaintiffs, and *each* of them.

(Emphasis added).

Based on the plain language of the complaint, it was not clearly erroneous to find that the complaint asserts that Defendants violated the duty of fair representation with respect to all Plaintiffs in connection with both the Accretion Agreement and the Bankruptcy Agreement. Therefore, it was not an abuse of discretion for the district court to conclude that, had Plaintiffs' counsel made a reasonable pre-filing inquiry concerning the allegations in the complaint and the dates of employment of the named Plaintiffs, it would have discovered that there was no factual basis for asserting a breach of the duty of fair representation on behalf of all 179 Plaintiffs for both the Accretion Agreement and the Bankruptcy Agreement.

Finally, Plaintiffs' counsel contends that, at the time the complaint was filed, it was reasonable to rely on the dues-objector status petitions, listing the names of approximately eighty-two QSAs who claimed to have filed dues-objector status requests. After responses to Defendants' interrogatories were received, it was learned that fifty-nine of those eighty-two QSAs did not submit requests or were not paying dues at the time their request was made. Plaintiffs' counsel argues that it is improper to base sanctions on discovery responses completed well after filing. The district court's grant of sanctions is not based on this later discovery, but on the fact that a cursory pre-filing investigation would have revealed that counsel's reliance on the petition letters was misplaced. Discovery revealed that QSAs signed the petition letters without reading the contents. In one case, a Plaintiff testified that her signature had been affixed to the petition without her knowledge or consent. It was not an erroneous assessment of the evidence for the district court to conclude that a pre-filing investigation would have raised significant concerns about the manner in which the petitions were distributed and the factual basis supporting the dues-objector status claim.

Plaintiffs' counsel's failure to adequately research the factual basis for the claims asserted in the complaint at the time of filing, and counsel's continued failure to refrain from pursuing meritless claims well over a year into the litigation support the district

court's findings.  We therefore, **AFFIRM** the grant of Rule 11 sanctions, noting that the amount of sanctions to be awarded is a question that remains before the district court and requires careful consideration.[4]

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the district court's grant of summary judgment on Counts I and II and the grant of Rule 11 sanctions.

---

[4]Although the court expresses no opinion regarding the amount of sanctions to be awarded, it should be noted that, when determining the amount to award, the goals of Rule 11 must be considered and "reasonable" does not necessarily mean "actual" expenses. *INVST Fin. Group, Inc. v. Chem-Nuclear Sys. Inc.*, 815 F.2d 391, 404 (6th Cir. 1987).